<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("NAACP"); the NEWARK BRANCH, NAACP; the NEW JERSEY STATE CONFERENCE NAACP; ALLEN WALLACE; LAMARA WAPPLES; and ALTARIK WHITE,<br><br>                Plaintiffs,<br><br>    v.<br><br>NORTH HUDSON REGIONAL FIRE & RESCUE, a body corporate and politic of the State of New Jersey,<br><br>              Defendant. | Civ. No. 07-1683 (DRD)<br><br>**O P I N I O N** |

Appearances:

RABNER, ALLCORN, BAUMGART & BEN-ASHER, PC
By:  Eugenie F. Temmler, Esq.
52 Upper Montclair Plaza
PO BOX 43416
UPPER MONTCLAIR, NJ 07043

ROSE & ROSE, PC
By: David L. Rose, Esq.
    Joshua N. Rose, Esq.
1320 19th Street NW, Suite 601
Washington, DC 20036

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
By: Angela Ciccolo, Esq.
    Anson Asaka, Esq.
4805 Mt. Hope Drive
Baltimore, MD 21215

*Attorneys for Plaintiffs*

CHASAN, LEYNER & LAMPARELLO, PC
By:  Thomas R. Kobin, Esq.
     Joseph A. Lagana, Esq.
300 Harmon Meadow Boulevard
Secaucus, NJ 07094

     *Attorneys for Defendant*

**<u>DEBEVOISE, Senior District Judge</u>**

     Plaintiffs, the National Association for the Advancement of Colored People ("NAACP"), the Newark Branch of the NAACP, the New Jersey State Conference of the NAACP, Keith Reeves, Allen Wallace, Lamara Wapples, and Altarik White (collectively, "Plaintiffs") filed this action on April 10, 2007 against North Hudson Regional Fire & Rescue ("NHRFR") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49.  Plaintiff Keith Reeves has been dismissed from the case. On March 26, 2008, NHRFR filed a motion to bar class certification, and Plaintiffs cross-moved, on April 9, 2008, for class certification and for a preliminary injunction.  At the May 5, 2008 oral argument, the court determined that the motions were made prematurely and that prudence required waiting to decide them until more facts came to light.  On August 13, 2008, without further communication with the court about the existing, stayed motions, the Plaintiffs filed an amended motion to certify the putative class of plaintiffs, and to bifurcate the action into two trials – one for liability and injunctive relief, and one for damages.  On October 6, 2008, the court heard oral argument on the motion for class certification and bifurcation.  At that hearing, the attorneys for both the Defendant and the Plaintiffs represented to the court that they had just obtained data from the Department of Personnel ("DOP") which was pertinent to the motion for

class certification, that they had sent that data to their respective experts for analysis, and that they would submit further papers to the court regarding that data.  On November 25, 2008, having heard nothing from the parties, the court ordered that the pending motions for class certification, bifurcation and preliminary injunction be administratively terminated.  On December 23, 2008, the Plaintiffs filed an amended motion for class certification and bifurcation and re-filed the same motion for preliminary injunction that they had filed on April 7, 2008.  On January 13, 2009, the Plaintiffs re-filed the same motion for class certification and bifurcation that they had filed on December 23, 2008 (with a change only to the signature block and date) and filed an amended motion for preliminary injunction.  NHRFR opposes Plaintiffs' motions.  For the following reasons, Plaintiffs' motion for class certification is granted; Plaintiffs' motion for bifurcation is dismissed as premature; and Plaintiffs' motion for preliminary injunction is granted to the extent that NHRFR is enjoined from hiring candidates from its current DOP list until it obtains a list from the DOP that expands the residency requirement to include Hudson, Essex and Union counties.

## I.  FACTS

### A.    The NHRFR

The NHRFR is a consolidated municipal fire department and political subdivision of the State of New Jersey that serves several communities in North Hudson County.  The NHRFR was formed in 1998 in accordance with the Consolidated Municipal Services Act, N.J. Stat. Ann. 40:48B-1, et. seq., and is essentially a consolidation of the former fire departments of Guttenberg, North Bergen, Union City, Weehawken and West New York (collectively, the "Member Municipalities").  Civil service positions such as firefighter are subject to the

3

examination process administered by the DOP.  N.J.A.C. 4A:4-1.1.   The NHRFR is subject to

the New Jersey Civil Service Act, N.J. Stat. Ann. 11A:1-1, et seq., and the rules and regulations

promulgated thereunder.  See N.J.A.C. 4A:1-1 et seq.  As such, to be hired by the NHRFR, a

person must apply for and take an examination administered by the DOP.  The DOP controls all

aspects of the exam, from scheduling to content and scoring.  Recently, the DOP administered

the firefighter exam in 1999, 2002, 2003, and 2006.  Those who take the exam at the same time

are ranked on a list based on their test scores on the written, and, sometimes, physical

examinations.  Based on these scores, the DOP creates eligibility lists from which organizations

subject to the New Jersey Civil Service Act, such as the NHRFR, may hire candidates in rank

order.  N.J.A.C. 4A:4-3.1 & 3.2.  When the NHFRF needs to fill a vacancy, it offers the position

to the highest ranked person(s) on the list provided to it by the DOP.  Passing the DOP test,

however, is not the only requirement for inclusion on the NHRFR's list.  In order to be placed on

the NHRFR's list, a candidate must also live in the Member Municipalities at the time he or she

took the test.  If the applicant does not live in the Member Municipalities at the time of the

administration of the exam, her name will not be placed on the NHRFR's list and, thus, the

candidate will not be eligible to be hired by the NHRFR, no matter how high her test score.

Plaintiffs allege that this geography-based hiring plan causes discrimination against African-

Americans who reside in the southern part of Hudson County and neighboring Essex and Union

counties.

    As of July 2008, according to the NHRFR's EEO-4 form, the NHRFR had 323 full time

employees.  Of those employees, two were African American, 64 were Hispanic, 255 were white

and two identified as other races.  Of the NHRFR's 323 full time employees, 302 were

firefighters (or protective service workers).  Of these, two were African American, 58 were

Hispanic and 240 were white.  In 2000, the population of the Member Municipalities was 69.6

percent Hispanic, 22.9 percent white non-Hispanic, and 3.4 percent African American.

**B.    The Proposed Class and Motions**

Plaintiffs seek to pursue their claims in the form of a class-action and propose the

following definition for certification:

> African Americans who reside or resided in any municipality in
> Essex, Union, or Southern Hudson County, and who sought or are
> seeking employment as firefighters or others in positions for which
> North Hudson Regional Fire & Rescue hires and who have taken and
> passed an examination where the Department of Personnel requires
> such an examination.

There are three named plaintiffs currently in this action: Allen Wallace, Lamara Wapples, and

Altarik White (collectively, the "Named Plaintiffs").  All three Named Plaintiffs took the DOP

exam and wish to be considered for employment by the NHRFR.  At the time they took the

exam, all of the Named Plaintiffs lived in Essex, Union or Southern Hudson County.[1]

In addition to class certification, Plaintiffs also seek bifurcation of the trial (to separate

adjudication of liability and equitable relief from adjudication of damages) and a preliminary

injunction against NHRFR.  Plaintiffs ask the court to enjoin NHRFR from "hiring any

additional firefighters or other employees" until further order from this court and from "using any

list of eligible candidates that is based upon the Defendant's residency requirement."

---

[1]It is not relevant that one or more of the Named Plaintiffs no longer live in Essex, Union,
or Southern Hudson County, because the NHRFR's residency requirement is based on one's
residence at the time of the application to take the examination.

5

## II.  MOTION FOR CLASS CERTIFICATION

Plaintiffs' first motion is for certification of its proposed class.  To obtain class action certification, "plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met."  Baby Neal for and by Kanter v. Casey,  43 F.3d 48, 55 (3d Cir. 1994) (citing Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239 (3d Cir. 1974), cert. denied, 421 U.S. 1011 (1975)); Fed. R. Civ. P. 23(a).  As the Court of Appeals recently clarified, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met.  Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."  In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 307 (3d Cir. 2008).  Further, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action."  Id.  "[T]he court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it."  Id.

### A.      Rule 23(a)

Federal Rule of Civil Procedure 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

### i. _____*Numerosity*

The first requirement of Rule 23(a) is "numerosity" – that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). The Plaintiffs have submitted evidence that there are approximately 850 persons who are members of the putative class. (Decl. of Aimee D. Pringle, Plts.' Reply Br., Ex. 7.) Plaintiffs calculated this number from information supplied by the DOP that included names, addresses and other information regarding persons who had taken the NJ DOP firefighter examination for the test cycles since 1999 (i.e., 1999, 2002, 2003, and 2006). From this data, Plaintiffs isolated the persons who identified themselves as African American and lived in Essex, Union or South Hudson County at the time they took the test. From that list, Plaintiffs deleted the duplicates (persons listed two or more times because they took the exam on two or more dates) and those persons who failed the exam. The final list – consisting of persons who took and passed the exam in 1999, 2002, 2003 or 2006; who self-identified as African American; and who lived in Essex, Union, or South Hudson County at the time they sat for the test – contained 872 people.

NHRFR argues that the Plaintiffs have not proven numerosity because "Plaintiffs cannot even prove that the purported class exists." (Def.'s Opp'n Br. at 15.) NHRFR objects that the Plaintiffs did not provide data in support of their allegation that the putative class contains approximately 850 people, and that they did not provide further data regarding what year the putative class members took the test; whether they are still interested in working as firefighters;

whether they are still on a current DOP list; and where they live.  Plaintiffs have now provided data to support the number of members of the putative class, but it is not necessary to provide the further data identified by NHRFR.  The injury alleged by Plaintiffs is that the class members were harmed when they took and passed the DOP test but were limited in their opportunities for employment because of the residency requirement.  Plaintiffs' data supports their contention that over 850 African Americans have suffered this alleged harm when they took and passed the test, and it is thus not relevant where these putative class members currently live, whether they are on a current DOP list, etc.  Plaintiffs have proven that there are approximately 850 people who fit the definition of the proposed class.

NHRFR also argues that Plaintiffs have not proven that joinder of the members of the proposed class is impracticable.  NHRFR cites to Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp., 149 F.R.D. 65, 73-74 (D.N.J. 1993), where the court found that it was practicable to join 123 plaintiffs when all proposed class members were identifiable and filed individual complaints.  Although the proposed class members in this case are all identifiable by name, many of their addresses may be unknown given that some took the DOP exam almost ten years ago; further, only the Named Plaintiffs in this case have filed individual complaints. NHRFR also argues that "numerosity may be defeated if the putative class members live close in proximity to each other."  (Def.'s Opp'n Br. at 14.)  NHRFR cites to Christiana Mortgage Corp. v. Delaware Mortgage Corp., 136 F.R.D. 372, 377-78 (D. Del. 1991), where the district court found that joinder was a feasible alternative to class certification when all 28 members of a proposed class were located within a small geographic region.  Even if all of the approximately

850 members of the proposed class here still live in Essex, Union or Southern Hudson County,

joinder of over 800 additional plaintiffs would simply be impracticable.

### ii.    Commonality

"The concepts of commonality and typicality are broadly defined and tend to merge.

Both criteria seek to assure that the action can be practically and efficiently maintained and that

the interests of the absentees will be fairly and adequately represented." Baby Neal, 43 F.3d at

56.  The two requirements, however, are distinct.  Id.  "Commonality does not require an identity

of claims or facts among class members; instead '[t]he commonality requirement will be satisfied

if the named plaintiffs share at least one question of fact or law with the grievances of the

prospective class.'" Johnston v. HBO Film Mgmt. Inc., 265 F.3d 178, 184 (3d Cir. 2001)

(quoting In re the Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 310 (3d Cir.

1998) and Baby Neal, 43 F.3d at 56).  Because the requirement may be satisfied by a single

common issue, it is easily met.  Baby Neal, 43 F.3d at 56.

Here, the Plaintiffs allege that NHRFR's residency requirement has a disparate impact

against African American residents of Essex, Union and Southern Hudson County in violation of

Title VII of the Civil Rights Act and the New Jersey Law Against Discrimination.[2]  This question

of law is common to all members of the putative class and is sufficient to meet the requirement

of commonality.

NHRFR argues that Plaintiffs cannot establish the commonality or typicality requirements

because the Named Plaintiffs' interests are contrary to the rest of the class because they seek

---

[2] This opinion is confined to discussion of the Plaintiffs' Title VII claim because the state law claim is analyzed in essentially the same way as the federal claim.  Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 398 (2005).

9

special consideration from the court to be hired ahead of any other class members. The Named

Plaintiffs, however, have withdrawn any request for such a preference in hiring. (Plts.' Reply Br.

at 9.) They seek only to challenge the residency requirement of the NHRFR's hiring practice,

which affects all members of the class equally. NHRFR also argues that the "interests" of the

class members in the different counties do not align; for example, NHRFR argues that the class

members in Southern Hudson County would want the residency requirement to be extended to

include Southern Hudson County, but not beyond into Essex or Union because it would create

more competition for jobs at NHRFR. These arguments do not in any way diminish the fact that

there is a common question of law among all potential class members regarding whether

NHRFR's hiring practice violates Title VII; rather, these arguments are more appropriately

addressed with respect to the "typicality" requirement and under Rule 23(b), both of which will

be discussed below.

### iii. Typicality

"The typicality inquiry is intended to assess whether the action can be efficiently

maintained as a class and whether the named plaintiffs have incentives that align with those of

absent class members so as to assure that the absentees' interests will be fairly represented."

Baby Neal, 43 F.3d at 57. "The typicality criterion is intended to preclude certification of those

cases where the legal theories of the named plaintiffs potentially conflict with those of the

absentees by requiring that the common claims are comparably central to the claims of the named

plaintiffs as to the claims of the absentees." Id. "Typicality entails an inquiry whether 'the

named plaintiff's individual circumstances are markedly different or . . . the legal theory upon

which the claims are based differs from that upon which the claims of other class members will

perforce be based.'" Id. at 57-58 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)). "Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying he individual claims." Id. at 58. "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Id. (quoting Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992)).

In this case, the claims of the Named Plaintiffs, and the legal theories underlying those claims, are the same as the claims of the putative class. Both claim that the NHRFR's hiring practice is discriminatory in that it has a disparate impact on African Americans in violation of Title VII. The Plaintiffs seek an order to preliminarily and permanently enjoin NHRFR from "classifying its applicants for employment and employees by residence or on other selection standards that discriminate or tend to discriminate against African Americans." (Am. Class Action Compl., Dec. 12, 2007, at 8.) The incentives of the Named Plaintiffs are thus the same as those of the proposed class members and the Named Plaintiffs will fairly represent the absentees' interests.[3]

NHRFR argues that the typicality requirement is not met in this case because the "interests" of the class members in the different counties do not align; for example, NHRFR argues that the class members in Southern Hudson County would want the residency requirement

---

[3] The Named Plaintiffs have withdrawn their request for preferential treatment in hiring if the NHRFR's residency requirement is changed, so any class member will be equally situated to the Named Plaintiffs with respect to the opportunity to be hired by the NHRFR – i.e., their names will be ranked on the DOP list by order of their scores on the exam.

to be extended to include Southern Hudson County, but not beyond into Essex or Union because it would create more competition for jobs at NHRFR.[4]  Absentees, however, do not have a legitimate interest in advocating for a policy that is discriminatory.  Rather, the Plaintiffs' goal, as already presented in their motion for preliminary injunction (discussed below), is to eliminate the residency requirement, which they claim has a disparate impact on African Americans.  If the residency requirement is, indeed, a discriminatory hiring practice, its elimination will benefit all class members.

NHRFR also argues that typicality is not met because "not every potential member of the class may want to challenge residency requirements" and that some potential class members may benefit from the residency requirements in other municipalities.  (Def.'s Opp'n Br. at 22.)  Whether residency requirements in other areas advantage potential class members or violate Title VII, however, is not relevant to this case.  Only the residency requirement of the NHRFR is at issue in this case.  For the foregoing reasons, the typicality requirement is met.

### iv.   Adequacy of Representation

The Court of Appeals has held that "'[a]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the

---

[4] NHRFR also argues that Plaintiffs cannot establish typicality "because the interests of those potential class members living in the Member Municipalities do not align with the Plaintiffs."  (Def.'s Opp'n Br. at 22.)  This argument is nonsensical because there are no potential class members living in the Member Municipalities.  The class members, by definition, live in South Hudson County, Essex or Union counties or lived there at the time they took the DOP exam.  A person who lived in the Member Municipalities at the time he or she took the exam would have been met the residency requirement and thus would have been eligible to be hired by NHRFR.

12

class.'" New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007)

(quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)).  The Plaintiffs'

counsel, the law firm of Rose & Rose, P.C., is over 20 years old and has represented the NAACP

in series of cases addressing allegedly discriminatory practices in municipalities throughout the

United States.  NHRFR does not object to the qualifications of Plaintiffs' counsel, so the court

finds that the first factor of adequacy of representation is satisfied.

As the Supreme Court has noted, the second prong of adequacy of representation – that

the plaintiff not have interests antagonistic to those of the proposed class – "tend[s] to merge

with the commonality and typicality criteria" because all three examine "whether the named

plaintiff's claim and the class claims are so interrelated that the interests of the class members

will be fairly and adequately protected in their absence."  Amchem Prods., Inc. v. Windsor, 521

U.S. 591, 626 n.2 (1997) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13

(1982)).  And as with the requirements of commonality and typicality, NHRFR again argues that

the interests of the Named Plaintiffs and of the proposed class members are contrary.  As

explained above, a class member does not have a legitimate interest in advocating for a

discriminatory hiring practice that will benefit him.  His only legitimate interest is in the

elimination of discriminatory hiring practices; the elimination of such practices will benefit all

members of the class and adequately represent their interests.

**B.      Rule 23(b)**

In addition to meeting the requirements of Rule 23(a), Plaintiffs must also satisfy one of

the requirements of Federal Rule of Civil Procedure 23(b).  Baby Neal, 43 F.3d at 58.  Rule 23(b)

provides that:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if: (1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

This requirement is almost automatically satisfied in actions primarily seeking injunctive relief. Baby Neal, 43 F.3d at 58. "When a suit seeks to define the relationship between the defendant(s) and the world at large, . . . (b)(2) certification is appropriate." Id. (quoting Weiss v. York Hospital, 745 F.2d 786, 811 (3d Cir. 1984)). Commentators have also noted that the language of (b)(2) does not even require that the defendant's conduct be directed or damaging to every member of the class. Id. Here, the Plaintiffs primarily seek injunctive relief. The main goal of the Plaintiffs' litigation is to obtain orders preliminarily and permanently enjoining

NHRFR from engaging in discriminatory employment practices.  (See Am. Class Action Compl., Dec. 12, 2007, at 8.)  The Named Plaintiffs have dropped their claim for priority in filling any of NHRFR's vacancies, so the only other relief sought is "make whole relief, including loss of income for the harm caused by racially discriminatory practices."  (Id.)  The injunctive relief, however, is clearly the primary focus of the suit, so Plaintiffs have satisfied Rule 23(b)(2).

Plaintiffs also satisfy the requirements of Rule 23(b)(3).  The question of law that predominates over any questions affecting individuals is whether the NHRFR's residency requirement is discriminatory in violation of Title VII of the Civil Rights Act.  As discussed, a class action to adjudicate the claims of the over 850 putative class members is superior to the other available methods (i.e., individual suits by each plaintiff).  The class members do not have a strong interest in individually controlling the prosecution of separate actions, because a finding that the alleged discriminatory hiring practice is indeed in violation of Title VII will benefit all class members in that the NHRFR will be ordered to change its hiring practices in order to eliminate the discrimination.  Additionally, thus far, this action is the only litigation regarding this issue and involving these class members.  And, lastly, these any case alleging discriminatory hiring practices by the NHRFR would have to be brought in the district court for the District of New Jersey, so it is desirable to concentrate these actions into one case within the forum.

Because the Plaintiffs have satisfied the necessary requirements of Federal Rule of Civil Procedure 23, the proposed class will be certified.

## II.  MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek an order preliminarily enjoining NHRFR from "hiring any additional firefighters or other employees until further order of this Court" and from "using any list of eligible candidates that is based upon Defendant's residency requirement."  To prevail on a motion for a preliminary injunction, the moving party must prove "that (1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief."  Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (quoting Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)).

### A.      Likelihood of Success on the Merits

Plaintiffs allege that the NHRFR's residency requirement violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2002e-2 ("Title VII") because it has a disparate impact on African Americans.[5]  The challenge made my Plaintiffs is not to residency requirements per se or to the New Jersey statutes which give a municipality the power to decide whether applicants must be residents of the municipality.  Rather, Plaintiffs challenge the NHRFR's election to use its powers in a manner which excludes African Americans from employment.

---

[5] Again, this opinion is confined to discussion of the Plaintiffs' Title VII claim because the state law claim is analyzed in essentially the same way as the federal claim.  Gerety, 184 N.J. at 398.

i.       *Standard of Review – Title VII*

Under Title VII, it is unlawful for an employer "to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2002e-2(a)(2). Title VII prohibits both intentional discrimination and "disparate impact" discrimination, i.e., "employment practices adopted without a deliberately discriminatory motive, [which] may in operation be functionally equivalent to intentional discrimination." Newark Branch, NAACP v. City of Bayonne, 134 F.3d 113, 121 (3d Cir. 1998)(quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988)(internal quotations omitted)). The prohibitions under Title VII extend to practices that have a discriminatory impact, regardless of the employer's intent in implementing or carrying out those practices, unless the employer shows that the practice (1) is required by business necessity, Griggs v. Duke Power Co., 401 U.S. 424, 431(1971), Albemarle Paper Co. v. Moody, 422 U.S. 405, 434-35 (1977), or (2) otherwise significantly furthers the legitimate employment goals of the employer. Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 659 (1989).

"Disparate impact" cases proceed in two steps: "(1) the plaintiff must prove that the challenged policy discriminates against members of a protected class, and then (2) the defendant can overcome the showing of disparate impact by proving a 'manifest relationship' between the policy and job performance." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 239 (3d Cir. 2007) (discussing Griggs v. Duke Power, 401 U.S. 424 (1971)). To satisfy the first step, "it is not enough for a plaintiff to show that there are statistical disparities in the employer's workforce." Foxworth v. Pa. State Police, 228 Fed. App'x 151, 156 (3d Cir. 2007)(unpublished)(internal

17

quotations omitted).  Rather, plaintiffs must prove causation; they must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites."  Newark Branch, NAACP v. City of Bayonne, 134 F.3d 113, 121 (3d Cir. 1998) (quoting Wards Cove Packing Co., Inc. v. Antonio, 490 U.S. 642, 657 (1989) (internal quotations omitted)).  "To prove causation through statistical evidence alone, the statistics must be 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group . . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.'"  Id. (quoting Watson, 487 U.S. at 994-95).  "The 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market.'"  Id. (quoting Wards Cove, 490 U.S. at 650).

The second step, where the burden of production shifts to the defendant, is "known as the 'business necessity' defense, and it serves as an employer's only means of defeating a Title VII claim when its employment policy has a discriminatory effect."  El, 479 F.3d at 239.  Successful assertion of the business necessity defense, however, can be overcome by the plaintiff "by showing that an alternative policy exists that would serve the employer's legitimate goals as well as the challenged policy with less of a discriminatory effect."  Id. at n.9.

18

ii.        *Expert Report of Richard Wright*

To establish a prima facie case of disparate impact, the Plaintiffs present the expert report of Dr. Richard Wright, a professor of Geography whose scholarly work focuses on the operation of labor and housing markets in the United States.  First, Dr. Wright states that, based on his study of patterns of employment in the United States in private sector and public sector jobs, he has "found that African Americans generally have a disproportionately high interest in, and availability and qualification for, employment in the public sector as compared to the private sector."  (Report of Richard Wright, June 27, 2008, ¶ 2.)  To support this assertion, Dr. Wright offered the following data developed by the United States Equal Employment Opportunity Commission ("EEOC") from its 2005 EEOC - 4 reports.  The chart below compares the percentage of employees in state and local government who are African American versus the percentage of employees in the private sector who are African American:

|  | U.S. as a Whole | New Jersey |
|---|---|---|
| Employment of African Americans in State & Local Government | 18% of total employment | 23.8% of total employment |
| Employment of African Americans in Municipal Protective Service Jobs (mostly police officers and fire fighters) | 17.6% of total employment | 20.0% of total employment |
| Employment of African Americans in the Private Sector | 14.1% of total employment | 15.3% of total employment |

(Id. ¶ 3.)  Based on this data, Dr. Wright asserts that, in the United States as a whole as of 2005, African Americans were 1.34 times more likely to work in state and local government than in the

private sector.  (Id.)  In New Jersey, as of 2005, African Americans were 1.56 times more likely to work in state and local government than in the private sector.  NHRFR's expert, Dr. Bernard Siskin, agrees with Dr. Wright's assertion that African Americans generally have a disproportionately high interest in and availability for employment in the public sector as compared to the private sector, but disagrees that African Americans have disproportionately high qualifications for employment as police and firefighters.  (Report of Bernard Siskin, Nov. 18, 2008, ¶ 18.)

Next, Dr. Wright compared the proportion of African Americans in full time state and local government in both Hudson County and New Jersey with the proportion of African Americans employed by the NHRFR,[6] and calculated an expected number of African Americans to be employed by the NHRFR using the percentage of African Americans in full time state and local government as a basis.  The NHRFR has 323 full time employees, two of whom are African American.

| | Proportion of AAs Employed in State & Local Government | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
|---|---|---|---|
| Hudson Co. | 12% | 39 (12% of 323) | 6 standard deviations |
| New Jersey | 23.8% | 77 (23.8% of 323) | 9.8 standard deviations |

---

[6]Dr. Wright's first report used EEO-4 data from 2006, which showed that 1 of 308 of NHRFR's full time employees were African American.  Dr. Wright's second report (in response to Dr. Siskin's report), dated Dec. 29, 2008, used EEO-4 data from 2008, which showed that 2 of 323 of NHRFR's full time employees were African American.  This opinion discusses the calculations in Dr. Wright's second report because it is based on more recent data and on the same data used by Dr. Siskin.  Dr. Wright's numerical results changed very little with the substitution of the data from 2008, and Dr. Wright's conclusions in both reports are the same.

Dr. Wright opines that if a disparity is six standard deviations, the probability of a chance

occurrence is "almost zero," and that if a disparity is 9.8 standard deviations, the probability of a

chance occurrence is "indistinguishable from zero."  (Report of Richard Wright, Dec. 29, 2008,

¶ 3.)

Dr. Wright also compared the proportion of African Americans employed by the NHRFR

with the proportion of African Americans in the population in general (1) of the Member

Municipalities; (2) within a five mile radius of the centroid of North Hudson; and (3) within a ten

mile radius of the centroid of North Hudson.

| | Proportion of AAs in the Population | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
|---|---|---|---|
| Member Municipalities | 3.4% | 11 (3.4% of 323) | 2.76 standard deviations |
| 5 Mile Radius | 5.8% | 19 (5.8% of 323) | over 4 standard deviations |
| 10 Mile Radius | 15.8% | 51 (15.8% of 323) | 7.47 standard deviations |

Dr. Wright opines that if a disparity is 2.76 standard deviations, the probability of this difference

resulting from a chance occurrence is about 3 in 1000; if a disparity is over four standard

deviations, the probability of this difference resulting from a chance occurrence is

"indistinguishable from zero;" and if a disparity is 7.47 standard deviations, the probability of

this difference resulting from a chance occurrence is "indistinguishable from zero."  (Report of

Richard Wright, Dec. 29, 2008, ¶ 4.)

Additionally, Dr. Wright examined commuting times in order to define the expected labor market for the NHRFR.  The United States Census Bureau reports that the average daily commute to work in 2003 in the United States was 24 minutes and in Hudson County was 29 minutes.  (Report of Richard Wright, June 27, 2008, ¶ 8.)  Dr. Wright performed a Geographic Information System (GIS) analysis of the population, by broad racial/ethnic group within five mile and ten mile bands from the centroid of North Hudson.  He opined that much of the area within the ten mile band was within the 29 minutes average commuting time for Hudson County. (Id.)  Relatedly, Dr. Wright opines that the appropriate labor market from which NHRFR may be expected to draw its protective service personnel is either the whole state or the neighboring three-county area.  Dr. Wright asserts that persons whose occupations are constrained by states' requirements, such as the requirement of a license to practice psychiatry, tend to search for jobs statewide.  Because "[f]irefighters in New Jersey must have passed various firefighter exams, which are statewide tests," he opines that "[i]t follows that their job search field may be considered statewide."  (Id. ¶ 10.)

Dr. Wright then compares the proportion of African Americans employed by the NHRFR with the proportion of African Americans in New Jersey's workforce or in the Tri-county area engaged in full time protective service work.

|  | Proportion of AAs Employed in Full Time Protective Service Work | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
|---|---|---|---|
| Tri-county | 37.4% | 121 (37.4% of 323) | 13 standard deviations |
| New Jersey | 20% | 65 (20% of 323) | 8.76 standard deviations |

22

Dr. Wright opines that disparities of 13 and 8.76 standard deviations have "virtually no probability" of occurring by chance. (Report of Richard Wright, Dec. 29, 2008, ¶ 5.)

Based on his calculations, Dr. Wright concludes that African Americans "are significantly under-represented" in the NHRFR's work force and he "infer[s] that this likely results from discriminatory hiring practices." (Report of Richard Wright, June 27, 2008, ¶ 15.) He also concludes that the data he examined "clearly shows that African Americans can and do work in substantial numbers and proportions for municipal governments within [NHRFR's] labor market area." (Id. ¶ 16.)

### iii.   *Expert Report of Bernard Siskin*

In response to the Plaintiffs' expert report, NHRFR presents the expert report of Dr. Bernard Siskin, a Director of LECG, LLC, an expert services and consulting firm. Dr. Siskin specializes in the application of statistics to the analysis of employment practices. In his report, Dr. Siskin takes several different approaches to analyze the effect of the NHRFR's residency requirement on its employment of African Americans. For all of his analyses, Dr. Siskin examines the following geographic regions: (1) the Member Municipalities; (2) the area within five miles of the NHRFR service area; (3) the area within ten miles of the NHRFR service area; (4) Hudson County; and (5) the area within the tri-county area (Hudson, Essex, and Union).

First, Dr. Siskin examines the issue with the assumption that the relationship between the racial/ethnic mix of the population of those interested in and qualified to work for NHRFR is the same in the expanded areas as within the Member Municipalities. Dr. Siskin contends that this assumption will generally overestimate the increase in the number of African Americans hired or

in the pool of applicants because as the area expands out from the Member Municipalities, "the more African American the area is and, logically, one would expect that the further the commute, the lower the likelihood that one would chose [sic] to join the NHRFR, especially if equal opportunities existed closer to the individual's residence."  (Report of Bernard Siskin, Nov. 18, 2008, ¶ 8.)  African Americans make up 0.62 percent of the employees in the NHRFR, and make up 3.6 percent of the population of the Member Municipalities.  Dr. Siskin uses this ratio (0.62/3.6 = 17.22%)  as a "link or benchmark between the racial/ethnic mix of the population and the racial/ethnic mix among those interested and qualified for the position."  (Id. ¶ 9.)  Assuming the same relationship exists in the other areas, Dr. Siskin estimates the number of African Americans expected in the NHRFR workforce if it were expanded to include the following areas:

| Geographical Area | Expected Number of African Americans in NHRFR Workforce |
| --- | --- |
| Member Municipalities | 2 (actual number) |
| Hudson County | 8 |
| Tri-county | 15 |
| New Jersey | 8 |
| 5 Mile Radius | 3 |
| 10 Mile Radius | 9 |

(Id. at Table 4.)  Dr. Siskin asserts that under this calculation, removing the residency requirement would be expected to result in a small increase in the percent of African Americans in NHRFR's workforce and a substantial decrease in the number of Hispanics in the NHRFR's workforce with the primary benefit of the change accruing to non-Hispanic whites.  (Id. ¶ 10.)

Next, Dr. Siskin calculates the expected number of African Americans in the NHRFR workforce based on actual applicants and their scores on the 1999, 2002, and 2006 exams (from data obtained from the DOP) if the residency requirement were changed to the different geographical areas listed in the table above.  Dr. Siskin created new DOP lists (excluding applicants of unknown racial background) using veteran's status and final average test scores to rank the applicants as they would have been ranked if the residency requirement were changed to Hudson County, the Tri-county area, a five mile radius or a ten mile radius.  He calculated the racial breakdown of the applicants in the top 35, top 50, top 65 and top 90 of those lists and also the change vis a vis the racial composition of the actual DOP (challenged) lists.  For each of these three years, expansion of the geographic area to within five miles or to all of Hudson County results in the addition of only one to three African Americans and the addition of several whites at the expense of Hispanic applicants (varying from year to year and among the top 35, top 50, top 65 and top 90 lists).  Once the geographic area is expanded to within 10 miles or to the Tri-county area, however, for the years 1999 and 2006, there is a significant increase in the number of African Americans.  (See id. at Table 6-1999 and 6-2006.)  For example, on the 1999 list, the number of African Americans added when the list is expanded to the Tri-county area is: 12 added in the top 35; 15 added in the top 65; and 18 added in the top 90.  (Id. at Table 6-1999.)  These additions are at the expense of both whites and Hispanics, but more heavily at the expense of Hispanics.  On the 2002 list, the expansion of the geographic regions has a much smaller impact on the number of African Americans.  (See id. at Table 6-2002.)  For example, when the 2002 list is expanded to within 10 miles, only three African Americans are added, even when the list extends into the top 90; additionally, the number of Hispanics decreases while the number of

25

whites increases.  (Id.)  When the 2002 list is expanded to the Tri-county area, ten African

Americans are added.  Based on these calculations, Dr. Siskin concludes that doing away with

the residency requirement would adversely impact Hispanic candidates, generally would cause

white representation to increase and, "with the exception of the larger expanded (i.e., Tri-County)

area, there is a trivial increase in African Americans."  (Id. ¶ 13.)

      Dr. Siskin's last analysis uses the same revised DOP lists based on the expanded

geographical regions for the residency requirement but incorporates the assumptions that if a

non-resident applicant received an appointment elsewhere, he would accept that appointment and

not be in competition for a position at NHRFR.  Dr. Siskin bases this assumption on data that

indicates that, among the appointments from the DOP lists in New Jersey, an applicant was very

likely to be appointed within the jurisdiction in which he/she resided.  Excluding NHRFR

appointments, of the 1,820 appointments made since 1999, 60 percent were in the jurisdiction in

which the applicant resided; the value increases to 78 percent[7] among veterans.  Among African

Americans, the home town appointment rate was 73 percent overall and 81 percent among

veterans.  (Id. ¶ 15.)  Dr. Siskin recalculated the racial make-up of the top 35, top 50, top 65 and

top 90 on the lists for 1999 and 2002 using this new assumption.  This new assumption did not

affect the lists for 1999 at all (see id. Table 6-1999 and Table 8-1999) and resulted in the addition

of a few more African Americans to the Tri-county list for 2002.  (See id. Table 6-2002 and

Table 8-2002.)  For the 2006 lists, Dr. Siskin not only excluded non-resident applicants who had

received an appointment elsewhere, but he also excluded applicants whose rank on some other

--------

      [7]Dr. Siskin's report gives this value as "[s]even-eight" percent, but the court assumes the
intended value is seventy-eight (78) percent.

list was substantially better than his rank on the new NHRFR list.  Dr. Siskin defined

"substantially better" as having a rank order number (where a lower number means a better rank)

on the expanded NHRFR list at least twice the best rank order number on another list.  This new

assumption drastically changed the 2006 lists.  With the exclusion of those having a significantly

better rank on another list, either zero or only one African American is added to the 2006 lists.

There are few changes in any geographic area for the top 35 and top 50 lists; in the top 65 and top

90 lists whites gain between two and eleven spots while Hispanics lose between three and 17

spots.  Based on these additional calculations, Dr. Siskin again concludes that "doing away with

the residency requirement/preference would adversely impact Hispanic candidates, generally

increase white representation and generally have a trivial impact on African Americans."  (Id.

¶ 16.)

       ***iv.***    ***Comparison of Experts' Reports***

       As the Court of Appeals has explained, in determining whether a plaintiff has presented a

prima facie case of disparate impact through presentation of statistics, the plaintiff must prove

not only statistical disparities in the employer's workforce, but also that the challenged practice

causes that disparity.  In the statistical analysis, "[t]he 'proper comparison [is] between the racial

composition of [the at-issue jobs] and the racial composition of the qualified . . . population in

the relevant labor market.'"  City of Bayonne, 134 F.3d at 121 (quoting Wards Cove, 490 U.S. at

650).  Here, the racial composition of the at-issue jobs is known:  it is undisputed that two out of

the 323 employees of the NHRFR are African American.  Each party's expert, however, provides

a different view of both the qualified population and the relevant labor market.

### a.      Relevant Labor Market

Only the Plaintiffs present an analysis of what area should comprise the relevant labor market.  As discussed above, based on his analysis of commuting times and other considerations in a job search, Dr. Wright concluded that "the appropriate labor market from which North Hudson [NHRFR] may be expected to draw its prospective service personnel is either the whole state or the neighboring three county area."  Because Dr. Wright's conclusion regarding the relevant labor market is based in sound reasoning, and because NHRFR did not dispute this particular conclusion of Dr. Wright, the court will consider the relevant labor market to be either the Tri-county area or the entire state of New Jersey.

### b.      Racial Composition of the Qualified Population

Dr. Siskin and Dr. Wright present different views on how to define the "qualified population" to be considered in this analysis.  Given the relevant labor market as either the Tri-county area or the entire state of New Jersey, however, both expert's reports support a finding of discrimination based on a disparate impact from the residency requirement.  Dr. Wright calculates the number of African Americans one would expect to be employed by the NHRFR based on several metrics, including the proportion of African Americans employed in state and local government and the proportion of African Americans in the population in general.  These metrics, however, do not fully account for the requirement that the population be qualified.  Certainly the population in general cannot be assumed to be qualified for a job with the NHRFR, and it is unclear whether the qualifications for employment in state and local government in New Jersey would be similar to those required for a ranking on the DOP list.  The last comparison

made by Dr. Wright more closely tracks the requirement of a qualified population because it uses the percentage of African Americans engaged in full time protective service work in the relevant labor markets to predict the percentage of African Americans one would expect to be employed by the NHRFR.  The qualifications for employment in full time protective service work in the Tri-county area or in New Jersey would be the same as or similar to the qualifications to be employed by the NHRFR.  Dr. Wright calculated that because 37.4% of those employed full time in protective service work in the Tri-county area are African American, one would expect 37.4%, or 121, of the employees of the NHRFR to be African American.  In the alternative, because 20% of those employed full time in protective service work in New Jersey are African American, one would expect 20%, or 65, of the employees of the NHRFR to be African American.  The difference between these expected numbers of African Americans – 121 or 65 – and the actual number employed by the NHRFR – 2 – is striking and is sufficiently substantial to raise an inference of causation.  Dr. Siskin asserts that Dr. Wright's analyses are "critically flawed because he never attempts to control for differences in the likelihood of being qualified for the position, as determined by the results of the N.J. D.O.P. process for firefighter eligibility." (Report of Dr. Siskin, Nov. 18, 2008, ¶ 20.)  While this is a valid criticism of Dr. Wright's comparisons using only general population data or data on the percentage of African Americans employed in state and local governments, Dr. Wright's last analysis accounted for the likelihood of being qualified for the position because it was based on a percentage of African Americans in full time protective services in the relevant labor markets.

Further, Dr. Siskin's own analyses using the DOP test results, when considered in the relevant labor market, further supports an inference of causation.  Using the actual DOP test

results obviously accounts for the requirement that the population being compared is "qualified." While his analyses did not show any significant increase in the number of African Americans who would be on the DOP lists if the residency requirement were expanded to within five miles of the NHRFR service area or to all of Hudson County, once the geographic area was expanded to include the relevant labor market of the entire Tri-county area, a significant number of African Americans were added to the DOP lists.  Dr. Siskin also asserts that a change in the residency requirement of the NHRFR would benefit whites at the expense of the employment prospects of Hispanics.  The employment prospects of Hispanics, however, is not relevant to whether NHRFR's current hiring practices discriminate against African Americans.  Discriminatory hiring practices against one group may not be maintained to benefit another group, even if that other group is a protected class.

Based on the above discussion, the Plaintiffs have established a prima facie case of discrimination.  The NHRFR has not offered any reason that the residency requirement is a business necessity and the court us unaware of any reason, particularly given the fact that the residency requirement is based only upon an applicant's residence at the time he or she takes the exam.  NHRFR employees are free to live where ever they choose, so the NHRFR cannot argue that it is interested in its employees living close to their place of employment so as to be able to get to work quickly.  The Plaintiffs have thus proven a likelihood of success on the merits.

**B.**      **Irreparable Harm to the Moving Party**

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary

damages." Adams v. Freedom Forge Corp., 204 F.3d 475, 485 (3d Cir. 2000).  The Plaintiffs

claim that they will be irreparably harmed if NHRFR hires any new firefighters during the

pendency of this litigation because those hires will gain training, experience and seniority while

the Plaintiffs are not eligible to be considered for any open positions because they are not on the

NHRFR's DOP list.  The NHRFR argues that, "if the Plaintiffs prevail, their hiring date may be

retroactively set for seniority purposes through the DOP," and that "[t]raining and experience

may also be remediated by additional training if the Plaintiffs ultimately succeed."  (Def.'s Opp'n

Letter Br. at 9.)  While the problem of seniority could be fixed, the lost training and experience

would be harder, if not impossible, to compensate.  Additional training could make up for some

of the lost training, but there is a practical limit on the amount of additional training that a person

can receive in a given amount of time.  Thus, it could take months or years to make up for the

training lost during the pendency of this litigation.  Further, the actual experience lost could not

be regained.  Additional training cannot adequately substitute for on-the-job experience.  Thus,

the Plaintiffs have proven irreparable harm.

**C.      Harm to the Non-moving Party**

Plaintiffs claim that the hiring freeze they seek would not harm the NHRFR because it

has other alternatives, such as paying overtime to current employees.  NHRFR responds that it

provides emergency fire suppression and rescue services to one of the most densely populated

parts of the country, and if its ability to hire more protective service workers is taken away, it

threatens the critical public safety function served by the NHRFR.  NHRFR submitted the

certification of Jeffrey Welz, Executive Director of Administration for the NHRFR, in which Mr.

Welz explained that the NHRFR has a critical need for additional firefighters and a civilian

employee.  Given the crucial public safety function provided by the NHRFR, and its current

needs, as detailed in Mr. Welz's declaration, it would cause great harm to the NHRFR to impose

the injunction requested by the Plaintiffs – a hiring freeze.  However, an order to enjoin the

NHRFR from hiring candidates from its current DOP list until it obtains a list from the DOP that

includes residents of all of Hudson, Essex, and Union counties would not cause the same harm.

Mr. Welz explained that when the NHRFR begins its hiring process, it requests a certification of

candidates from the DOP, which it expects to receive within two weeks of the request.  Thus, the

NHRFR could quickly inform the DOP of the change in the residency requirement for applicants

to be certified to its list and could then begin its new hiring process within two weeks.

## D.    Public Interest

As discussed above, the public interest would be harmed if the NHRFR were not able to

hire the employees it needs to carry out its task of providing emergency fire suppression and

rescue services in the Member Municipalities.  Thus, it would not be in the public interest to

impose a simple hiring freeze on the NHRFR.  The public interest is also served, of course, by

not allowing discriminatory hiring practices, so the proper balance of the competing interests is

satisfied by an order to enjoin the NHRFR from hiring candidates from its current DOP list and

to commence hiring only when it obtains a list from the DOP that includes residents of all of

Hudson, Essex and Union counties.[8]

---

[8] The court recognizes that members of the class, including the Named Plaintiffs, may not
have taken the most recent DOP exam and will have to take the next exam in order to be
included on a DOP list presented to the NHRFR.

## IV.  MOTION FOR BIFURCATION

The Plaintiffs also move for a bifurcated procedure with a trial for determining liability and equitable relief and, if necessary, another trial for determining damages.  Given the early stage of this litigation, a motion regarding the organization of the trial is premature and will be dismissed without prejudice.

## V.  CONCLUSION

For all the reasons stated above, Plaintiffs' motion for class certification is granted; Plaintiffs' motion for preliminary injunction is granted to the extent that NHRFR is enjoined from hiring candidates from its current DOP list and from commencing hiring until it obtains a list from the DOP that expands the residency requirement to include residents of Hudson, Essex, and Union counties.  Plaintiffs' motion for bifurcation is dismissed without prejudice as premature.  The court will implement this decision in an order of even date.


s/ Dickinson R. Debevoise
Dickinson R. Debevoise, U.S.S.D.J.


Dated:  February 18, 2009