**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
("NAACP"); the NEWARK BRANCH, NAACP; the
NEW JERSEY STATE CONFERENCE NAACP;
ALLEN WALLACE; LAMARA WAPPLES; and
ALTARIK WHITE,

                Plaintiffs,

      v.

NORTH HUDSON REGIONAL FIRE & RESCUE, a
body corporate and politic of the State of New Jersey,

                Defendant,

      v.

ALEX M. DeROJAS, RANDY VASQUEZ, CARLOS
CASTILLO, ORLANDO DUQUE, PABLO CLARO,

                Intervenor-Defendants.

Civ. No. 07-1683 (DRD)

**O P I N I O N**

Appearances:

RABNER, ALLCORN, BAUMGART & BEN-ASHER, PC
By: Eugenie F. Temmler, Esq.
52 Upper Montclair Plaza
PO BOX 43416
UPPER MONTCLAIR, NJ 07043

ROSE & ROSE, PC
By: David L. Rose, Esq.
    Joshua N. Rose, Esq.
1320 19th Street NW, Suite 601
Washington, DC 20036

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

By: Angela Ciccolo, Esq.
    Anson Asaka, Esq.
4805 Mt. Hope Drive
Baltimore, MD 21215

    *Attorneys for Plaintiffs*

CHASAN, LEYNER & LAMPARELLO, PC
By:  Thomas R. Kobin, Esq.
    Joseph A. Lagana, Esq.
300 Harmon Meadow Boulevard
Secaucus, NJ 07094

    *Attorneys for Defendant*

The Corrigan Law Firm
By:  David F. Corrigan, Esq.
    Bradley D. Tishman, Esq.

    *Attorneys for Intervenor-Defendants*

**<u>DEBEVOISE, Senior District Judge</u>**

    This suit is a disparate impact challenge to a consolidated municipal fire department, the

North Hudson Regional Fire & Rescue's ("NHRFR") use of residency requirements for hiring.

Plaintiffs, the National Association for the Advancement of Colored People ("NAACP"), the

Newark Branch of the NAACP, the New Jersey State Conference of the NAACP, Allen Wallace,

Lamara Wapples, and Altarik White[1] (collectively, "Plaintiffs") filed this action on April 10,

2007 against the NHRFR pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

1981, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to -49.  On February

18, 2009, the Court granted the Plaintiffs' motions for class certification and issued a preliminary

injunction, barring the NHRFR from hiring from its current eligibility list until it obtained a list

that expanded the residency requirement to include residents of nearby Essex and Union

Counties and the southern part of Hudson County.  The NHRFR filed an interlocutory appeal

---

[1] Plaintiff Keith Reeves has been dismissed from the case.

challenging the portion of this Court's decision that granted the preliminary injunction.  On September 21, 2009, while the appeal was pending, the Court granted a motion to intervene filed by six Hispanic firefighter candidates who were on the list from which the injunction prohibited the NHRFR to hire.  On March 1, 2010, the Court of Appeals for the Third Circuit sua sponte summarily remanded the matter to the District Court, for further proceedings in light of the Supreme Court's recent decision in Ricci v. DeStefano, 129 S. Ct. 2658 (2009).  On March 2, 2010, the Court ordered a briefing schedule and held oral arguments on April 12th.  The Court now finds preliminarily that the residency requirement in this case furthers legitimate business goals in a significant way and that the balance of the equitable factors weighs towards vacating the injunction.

## I.  BACKGROUND

The circumstances underlying this litigation are laid out in detail in the Court's February 18, 2009 opinion.  See NAACP v. North Hudson Regional Fire & Rescue, 255 F.R.D. 374 (D.N.J. 2009).  For the sake of brevity, the Court incorporates by reference the "background" section of that decision, and will refrain from revisiting the majority of the facts contained therein.

The NHRFR is a consolidated municipal fire department and political subdivision of the State of New Jersey that serves several communities in North Hudson County.  The NHRFR was formed in 1998 in accordance with the Consolidated Municipal Services Act, N.J. Stat. Ann. 40:48B-1, et. seq., and is essentially a consolidation of the former fire departments of Guttenberg, North Bergen, Union City, Weehawken and West New York (collectively, the "Member Municipalities").

In New Jersey, civil service positions such as firefighter are subject to the examination process administered by the New Jersey Department of Personnel ("DOP").  N.J.A.C. 4A:4-1.1.  As such, to be hired by the NHRFR, a person must apply for and take an examination administered by the DOP.  The DOP controls all aspects of the examination, from scheduling to content and scoring.  Recently, the DOP administered the firefighter examination in 1999, 2002, 2003, and 2006.  Those who take the examination at the same time are ranked on a list based on their test scores on the written, and, sometimes, physical examinations.  Based on these scores, the DOP creates eligibility lists from which organizations subject to the New Jersey Civil Service Act, such as the NHRFR, may hire candidates in rank order.  N.J.A.C. 4A:4-3.1 & 3.2.  When the NHRFR needs to fill a vacancy, it offers the position to the highest ranked person(s) on the list provided to it by the DOP.  Passing the DOP test, however, is not the only requirement for inclusion on the NHRFR's list.  In order to be placed on the NHRFR's list, a candidate must also live in the Member Municipalities at the time he or she took the test.  If the applicant does not live in the Member Municipalities at the time of the administration of the examination, her name will not be placed on the NHRFR's list and, thus, the candidate will not be eligible to be hired by the NHRFR, no matter how high her test score.

The Civil Service regulations authorize the use of residency requirements by municipalities and regionals.  N.J.A.C. 4A:4-2.11.  Consequently, a number of other municipalities, including Atlantic City, Camden, East Orange, Elizabeth, Hoboken, Jersey City, New Brunswick, Newark, Passaic, Paterson, Camden, East Orange, and Trenton all employ residency requirements.

As of July 2008, according to the NHRFR's EEO-4 form, the NHRFR had 323 full time employees.  Of those employees, two were African American, 64 were Hispanic, 255 were white

and two identified as other races.[2]  Of the NHRFR's 323 full time employees, 302 were firefighters.  Of these, two were African American, 58 were Hispanic and 240 were white.  In 2000, the population of the Member Municipalities was 69.6 percent Hispanic, 22.9 percent white non-Hispanic, and 3.4 percent African American.

Plaintiffs allege that the NHRFR's geography-based hiring plan causes discrimination against African-Americans who reside in the southern part of Hudson County and neighboring Essex and Union counties.   The Court found that the NHRFR had a likelihood of success on the merits of its Title VII disparate impact discrimination claim and issued the preliminary injunction on February 18, 2009, which enjoined the NHRFR "from hiring candidates from its current DOP list[3] and from commencing hiring candidates until it obtains a list from the DOP that expands the residency requirement to include residents of Hudson, Essex, and Union counties[4]."  North Hudson, 255 F.R.D. at 393.

On August 12, 2009, Intervenor-Defendants Alex DeRojas, Alexander Rodriguez, Randy Vasquez, Carlos A. Castillo, and Orlando Duque ("Intervenors") filed a third party motion to intervene.  Each of the Intervenors is a resident of a Member Municipality and is of Hispanic descent.  In 2006, after months of preparation, each of the Intervenors sat for the DOP firefighter examination and earned high scores.  On the Member Municipalities List, the Intervenors were ranked at 21, 25, 26, 45, 49, and 70, based on their respective test scores, and other factors, such as veteran status (none of the Intervenors are veterans).  Since the NHRFR currently needs to3 hire approximately 35 to 40 new firefighters, the Intervenors argue that it is likely they would have been hired, had the injunction not barred the NHRFR from hiring from the Member

---

[2] The parties use the terms "African American," "Hispanic," and "white" in their submissions, and the Court adopts the parties' terminology.
[3] Hereinafter referred to as the "Member Municipalities List."
[4] Hereinafter referred to as the "Tri-County List."

Municipalities List.  If the NHRFR were to hire from the Tri-County List, the Intervenors would effectively lose their chance to be hired, since their rankings would be significantly altered; for instance, the candidate who was ranked in 21st place on the Member Municipalities List would be ranked at 189th place on the Tri-County List, and so forth.  The Intervenors' stated reason for joining the suit was to challenge the preliminary injunction, which they claim has eroded their prospects for employment with the NHRFR.  The Court heard oral arguments on the motion to intervene on September 21, 2009 and granted the motion with an oral opinion from the bench.

## II.  DISCUSSION

### A.    Ricci v. DeStefano

The facts in the Ricci case are distinguishable from the instant case.  Ricci was a disparate treatment case in which the White and Hispanic firefighters charged that the City of New Haven (the "City") had discriminated against them by discarding the examinations in which they were high scorers (discriminatory treatment), and the City defended on the ground that had it applied the test results, it would have been liable to black firefighters on account of the tests' discriminatory impact.

The present case initially was a disparate impact case in which potential black firefighter candidates for positions in the NHRFR asserted that limiting applicant eligibility examinations to residents of the NHRFR's five constituent communities created an adverse impact on African American candidates.  The NHRFR defended on the grounds that the statistics failed to show a meaningful disparate impact and that implementation of the expanded geographical area would have an adverse impact upon Hispanics, another minority group.  Complicating the situation, six potential Hispanic firefighters intervened in the case to challenge the preliminary injunction

which prevents the NHRFR from making hiring decisions based on its current list of eligible candidates.

Whereas in <u>Ricci</u> the defendant City alleged that the examinations had a discriminatory impact, here the Plaintiff NAACP members allege that the hiring scheme has a discriminatory impact.  The context in which this suit arises is unique to New Jersey, where a state-wide statutory scheme permits municipal and regional bodies to limit hiring to their geographical area.  <u>See</u> N.J.A.C. § 4A:4-2.11.  Accordingly, municipalities and regionals have exercised their options.  The result of the various residency requirements is to skew the hiring to the racial proportions living in that community.  Additionally, some hiring areas have been set by court order or agreement in an effort to ensure the hiring of underrepresented racial or national groups.[5]  The NHRFR and a Hispanic group are parties to a settlement agreement that disposed of a 2001 disparate impact suit challenging the NHRFR's promotion system.  The agreement requires the NHRFR to make efforts to reach and attract qualified applicants of Hispanic origin.

Despite the factual differences between the two cases, the present case, like <u>Ricci</u>, must address the tensions between Title VII's disparate treatment provision and Title VII's disparate

---

[5]    The Intervenors argue:  "At some point this Court must wonder why Plaintiff NAACP continues to attack residency requirements in New Jersey piecemeal rather than attempting to address it with the State Legislature…."  (Def.-Int.'s Br. 16).

The Court agrees that this piecemeal system of residency requirements set by municipalities and court decree has created an environment in which many applicants for civil service positions, like firefighter, are denied the opportunity to compete for positions in neighboring communities in an open, merit-based market fashion.  This drawing of lines around communities necessarily leads to statistical disparities between the make-up of the civil service workforce in a given community and make-up of the population of the community's surrounding areas.

In an attempt to cure the disparate impact caused by community residential requirements, a number of communities, either by agreement or as a result of a court decree, have broadened the hiring area to include additional municipalities or counties.  As a result, applicants living in Municipality X that limits hiring to residents of Municipality X can apply for positions in a neighboring Municipality Y where residents are precluded from applying for positions in Municipality X.

impact provision, 42 U.S.C. § 2000e-2(a)(1), and 42 U.S.C. § 2000 2(k)(1)(A)(i).  Consequently a detailed examination of Ricci is in order.

In Ricci, the City of New Haven used objective examinations, along with certain other qualifications, to identify firefighters best qualified for promotion.  The City's contract with the firefighter's union provided for a written examination accounting for 60% and an oral examination accounting for 40% of an applicant's total score.  The City hired Industrial/Organizational Solutions, Inc. ("IOS") to develop and administer the examinations.  IOS conducted exhaustive studies to develop appropriate written and oral examinations, including special steps to ensure that the examinations would not unintentionally favor white candidates.  IOS developed a list of training manuals for each test.  The City opened a three-month study period and gave the candidates a list that identified the source materials for the questions.  Numerous other measures were adopted to ensure the fairness of the tests and to assist candidates to prepare to take them.  Many firefighters studied for months at considerable personal and financial cost.

Candidates took the examination in November and December 2003.  Seventy-seven candidates completed the lieutenant examination - 43 whites, 19 blacks and 15 Hispanics.  Eight lieutenant positions were vacant at the time of the examination.  Under the rule of three,[6] this meant that the top 10 candidates were eligible for an immediate promotion to lieutenant.  All 10 were white.  Subsequent vacancies would have allowed at least 3 black candidates to be considered.

Forty-one candidates completed the captain examination - 25 whites, 8 blacks and 8 Hispanics.  Of those, 22 candidates passed - 16 whites, 3 blacks and 3 Hispanics.  Seven captain

_____

[6] Under the City's charter, the relevant hiring authority must fill each vacancy by choosing one candidate from the top three scores on the list.  Certified promotional lists remain valid for two years.

positions were vacant at the time of the examination.  Under the rule of three, 9 candidates were eligible for immediate promotion to captain - 7 whites and 2 Hispanics.

These results engendered a bitter public debate.[7]  Some firefighters and public groups argued that the tests should be discarded because the results showed the tests to be discriminatory.  Other firefighters said the examinations were neutral and fair.  Each faction threatened a discrimination lawsuit if its position was rejected.  Hearings were held, IOS presented a detailed description of the process through which it went to develop the tests; and those demanding that the City reject the results produced witnesses and advocates of their position.  Ultimately the City threw out the examinations.

Certain white and Hispanic firefighters who likely would have been promoted based on their test performances sued the City and certain of its officials, charging a violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Equal Protection Clause of the Fourteenth Amendment.  The defendants defended their actions, arguing that if they had certified the results, they would have faced Title VII liability for adopting a practice that had a disparate impact on the minority firefighters.  The District Court granted summary judgment for the defendants, and the Court of Appeals affirmed.

The Supreme Court reversed, stating:

> We conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute.  The respondents, we further determine, cannot meet that threshold standard.  As a result, the City's action in discarding the tests was a violation of Title VII.  In light of our ruling under the statutes, we need not reach the question whether respondents' actions may have violated the Equal Protection Clause.

---

[7] Justice Alito's concurring opinion, 129 S. Ct. at 2683-2690, describes the intensity of the debate and the racial and political currents that entered into the ultimate decision to throw out the examination results.

The process by which the Court reached this result is instructive in the present case.  It noted that as originally enacted in 1964, Title VII's principal nondiscrimination provision held employers liable only for disparate treatment; that in Griggs v. Duke Power Co., 401 U.S. 424 (1971) the Court interpreted the Civil Rights Act of 1964 to prohibit, in some cases, employers' facially neutral practices that, in fact are "discriminatory in operation," id. at 431; and that the Civil Rights Act of 1991 included a provision codifying the prohibition on disparate-impact discrimination.  This left the law of disparate impact in the following posture:

> Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  42 U.S.C § 2000e-2(k)(1)(A)(i).  An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity."  Ibid. Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.  §§ 2000e-2(k)(1)(A)(ii) and (C).

129 S. Ct. at 2673.

The Court began its analysis with the premise that "[t]he City's actions would violate the disparate treatment prohibition of Title VII absent some valid defense."  Id.  It then found that "[a]ll the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race . . . i.e., how minority candidates had performed when compared to white candidates."  Id.  The Court proceeded to determine whether the City had a lawful justification for its concededly race-based action.  It had to interpret the statute to give effect to both the disparate-treatment and the disparate-impact provisions of the statute.

The Court rejected the petitioner's contention that an employer cannot take race-based adverse employment actions in order to avoid disparate impact liability even if the employer knows its practice violates the disparate-impact provision.  It also rejected, as discouraging

voluntary compliance, petitioner's suggestion that an employer in fact must be in violation of the disparate-impact provision before it can use compliance as a defense in a disparate-treatment suit.

Similarly the Court rejected respondent's contention that an employer's good-faith belief that its actions are necessary to comply with Title VII's disparate impact provision should be enough to justify race conscious conduct, noting that "the original, foundational prohibition of Title VII bars employers from taking adverse action 'because of . . . race.'" Id. at 2675. The 1991 disparate impact amendment made no exception in disparate treatment liability for actions taken in a good faith effort to comply with the new disparate impact provision. Such a minimal standard "could cause employers to discard the results of lawful and beneficial promotional examinations even where there is little if any evidence of disparate impact discrimination [and] would amount to a defacto quota system, in which a 'focus on statistics . . . could put undue pressure on employers to adopt inappropriate prophylactic measures.'" Id. at 2675.

Noting the relevance of Equal Protection Clause cases, the Court cited Richmond v. J.A., Crosson Co., 488 U.S. 469, 500 (1989), for the proposition "that certain government actions to remedy past racial discrimination actions that are themselves based on race are constitutional only where there is a "'strong basis in evidence' that the remedial actions were necessary.'" 129 S. Ct. at 2675. The Court adopted "the strong-basis-in-evidence standard as a matter of statutory construction to resolve any conflict between the disparate treatment and disparate impact provisions of Title VII." Id. at 1276. Applied to the Ricci situation:

> If an employer cannot rescore a test based on the candidates' race, § 2000e-2(1), then it follows a fortiori that it may not take the greater step of discarding the test altogether to achieve a more desirable racial distribution of promotion-eligible candidates -- absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision.

Id.

But the Court did not limit its holding to the examination situation.  It held as a general

rule that:

> We hold only that, under Title VII, before an employer can engage in intentional
> discrimination for the asserted purpose of avoiding or remedying an unintentional
> disparate impact, the employer must have a strong basis in evidence to believe it
> will be subject to disparate impact liability if it fails to take the race-conscious,
> discriminatory action.

Id. at 2677.

Applying this rule the Court accepted the contention that the racial adverse impact of the

test was significant and that the City was faced with a prima facie case of disparate impact

liability.  Based on how the passing candidates ranked and an application of the rule of three,

certifying the examination would have meant that the City could not have considered black

candidates for any of the vacant lieutenant or captain positions.  However, although these results

compelled the City "to take a hard look at the examinations to determine whether certifying the

results would have had an impermissible disparate impact. . . [t]he problem for respondents is

that a prima facie case of disparate impact liability -- essentially, a threshold showing of a

significant statistical disparity, and nothing more -- is far from a strong basis in evidence that the

City would have been liable under Title VII, had it certified the results."  Id. at 2678 (citation

omitted).

The City would have been subject to disparate impact liability "only if the examinations

were not job related and consistent with business necessity, or if there existed an equally valid,

less-discriminatory alternative that served the City's needs but that the City refused to adopt.  §

2000e-2(k)(1)(A)(C)."  Id.  The Court reviewed the extensive evidence in the case and found that

"[t]here is no genuine dispute that the examinations were job-related and consistent with

business necessity.  The City's assertions to the contrary are 'blatantly contradicted by the record.'"  Id.  As to a less discriminatory alternative, the Court found that the "[r]espondents also lacked a strong basis in evidence of an equally valid, less-discriminatory testing alternative that the City, by certifying the examination results, would necessarily have refused to adopt."  Id. at 2679.  To summarize, the Court concluded:

> On the record before us, there is no genuine dispute that the City lacked a strong basis in evidence to believe it would face disparate impact liability if it certified the examination results.  In other words, there is no evidence - - let alone the required strong basis in evidence - - that the tests were flawed because they were not job-related or because other, equally valid and less discriminatory tests were available to the City.  Fear of litigation alone cannot justify an employer's reliance on race to the detriment of individuals who passed the examinations and qualified for promotions.  The City's discarding the test results was impermissible under Title VII, and summary judgment is appropriate for petitioners on their disparate-treatment claim.

Because of the procedural and factual differences between Ricci and the present case, Plaintiffs urge that Ricci does not govern this case:

> The Court held that, because New Haven did not have a "strong basis in evidence" for setting aside the test, the stated reason for its decision - namely, its good faith effort to avoid liability under Title VII's disparate impact provision - was a mere pretext for discrimination.  Id. at 2681.

> No such facts are present in this case.  North Hudson, unlike the City of New Haven, has not preemptively set aside an examination, but instead has defended the residency requirement's lawfulness.  North Hudson cannot assert a Ricci defense in this case because the plaintiffs here are not white employees who benefit from an employment practice, but are prospective African American employees challenging the practice's lawfulness.

(Pl.'s Br. 3.)

The Plaintiffs cite United States v. The City of New York, 637 F. Supp. 2d 77 (E.D.N.Y. 2009) in support of their position.  In that case the government brought a Title VII action against the City and the City fire department, alleging that the fire department's reliance on written examinations in selecting entry-level firefighters had a disparate impact on black and Hispanic

candidates.  The court granted summary judgment for the government, finding that the statistical

evidence alone made a prima facie showing of disparate impact which the fire department failed

to justify.  The court offered a brief word about <u>Ricci</u>, "not because the Supreme Court's ruling

controls the outcome in this case; to the contrary, I mention <u>Ricci</u> precisely to point out that it

does not," continuing:

> In <u>Ricci</u>, the City of New Haven had set aside the results of a promotional
> examination, and the Supreme Court confronted the narrow issue of whether New
> Haven could defend a violation of Title VII's disparate treatment provision by
> asserting that its challenged employment action was an attempt to comply with
> Title VII's disparate impact provision.  The Court held that such a defense is only
> available when "the employer can demonstrate a strong basis in evidence that, had
> it not taken the action, it would have been liable under the disparate-impact
> statute."  <u>Id.</u> at 2664.  In contrast, this case presents the entirely separate question
> of whether Plaintiffs have shown that the City's use of Exams 7029 and 2043 has
> actually had a disparate impact upon black and Hispanic applicants for positions
> as entry-level firefighters.  <u>Ricci</u> did not confront that issue.

<u>Id.</u> at 83.

The court disagrees both with the Plaintiffs in the instant case and with the court in the

<u>City of New York</u> case.[3]  Because of the factual differences between <u>Ricci</u> and the instant case,

<u>Ricci</u> may not be fully "controlling," but because this case implicates the tensions between

disparate impact and disparate treatment, <u>Ricci</u> must be taken into account.

Although <u>Ricci</u> addressed a disparate treatment challenge to a city's discarding

examination results which the City justified on disparate impact grounds, <u>Ricci</u> is not limited to

that factual situation.  By its terms it applies not just to its unique facts, but to any situation when

the demands of Title VII's disparate treatment and disparate impact mandates present conflicting

demands.

---

[3]  The <u>City of New York</u> case was consistent with <u>Ricci</u> even though it found it not to be
controlling and reached the correct <u>Ricci</u> result because there was clearly a strong basis in the
evidence that use of the challenged examinations had a disparate impact on black and Hispanic
candidates.

> We consider, therefore, whether the purpose to avoid disparate-impact liability excuses what otherwise would be prohibited disparate treatment discrimination. Courts often confront cases in which statutes and principles point in different directions. Our task is to provide guidance to employers and courts for situations when these two prohibitions could be in conflict absent a rule to reconcile them. In providing this guidance our decision must be consistent with the important purpose of Title VII -- that the workplace be an environment free of discrimination, where race is not a barrier to opportunity.

129 S. Ct. at 2674.

After finding the City's invalidation of the promotional examinations could not be justified on the basis of Title VII's disparate treatment prohibition, the Court asserted the general applicability of its ruling:

> For the foregoing reasons, we adopt the strong-basis-in-evidence standard as a matter of statutory construction to resolve any conflict between the disparate treatment and disparate impact provisions of Title VII.

Id. at 2676 (emphasis added).

The strong-basis-in-evidence standard applies whether, in order to cure alleged discriminatory impact, the challenged action is initiated by the employer, such as the NHRFR, or whether the employer is ordered by a court to take the challenged action. There must be a strong basis in evidence either for the employer's action or for the court's order.

The court's February 18, 2009, preliminary injunction must be evaluated in light of Ricci's mandate.

**B.   Consideration of the Preliminary Injunction in Light of Ricci v. DeStefano**

The Court of Appeals instructed this Court to evaluate its factual and legal findings in light of Ricci. To prevail on a motion for a preliminary injunction, the moving party must prove "that (1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief." Rogers v. Corbett, 468 F.3d

188, 192 (3d Cir. 2006) (quoting Child Evangelism Fellowship of New Jersey, Inc. v. Stafford

Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)).  The Court may order the "extraordinary

remedy" of a preliminary injunction only if the moving party establishes all four factors in its

favor.  P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504,

508 (3d Cir. 2005).

      **i.**      **Likelihood of Success on the Merits**

In the Court's February 18, 2009 opinion granting the preliminary injunction, the Court

wrote that:

> The employment prospects of Hispanics, however, is not relevant to whether
> NHRFR's current hiring practices discriminate against African Americans.
> Discriminatory hiring practices against one group may not be maintained to
> benefit another group, even if that other group is a protected class.

255 F.R.D. at 391.

In light of Ricci, the Court's determination that "[t]he employment prospects of

Hispanics…is not relevant to whether NHRFR's current hiring practices discriminate against

African Americans," is not a correct statement of the law.[8]  Rather, where the contention arises

that a remedy for disparate impact will in practice constitute a race-based action causing

disparate treatment to a different group, the strong basis in evidence standard announced in Ricci

applies to the disparate impact claim.  Here, the "race-based" remedy would be throwing out the

NHRFR's residency requirement in order to "achieve a more desirable racial distribution" of

_____

[8] Support for the Court's prior position can be found in N.A.A.C.P. v. Harrison, 940 F.2d 792,
811 (3d Cir. 1991), in which the Court of Appeals affirmed this Court's decision to strike down a
residency requirement that was responsible for a marked disparity between the pool of qualified
black applicants for municipal jobs in Harrison and the actual black representation among the
Town's employees.  In that case, a group of residents who were on an eligible hiring list for
firefighter positions in the Town argued that invalidating the existing list infringed on their
rights.  The Court held that "[c]andidates who rank well on an eligibility list formulated as a
result of discriminatory practices do not have an absolute right to retain or even a legitimate
expectation of retaining that rank when the effect of those discriminatory practices is
eliminated."  Id.

candidates for hiring.[9]  See Ricci, 129 S. Ct. at 2677.  That result would only be legitimate when there is a strong basis in evidence that discarding the residency requirement is "necessary to avoid violating the disparate-impact provision" of Title VII.  See id. at 2676.

The Supreme Court did not provide detailed guidance as to how the strong basis in evidence standard should be applied.  See Ricci, 129 S. Ct. 2701 (Ginsburg, J., dissenting).  In the context of this Court's decision whether to vacate the preliminary injunction, the Ricci standard could be formulated as presenting the question whether the Plaintiffs have established a strong basis in the evidence that they are likely to succeed on the merits of their disparate impact case.  The Court finds that the statistical evidence does show a statistical disparity, but the NHRFR may have a valid business necessity defense, so the Court finds that overall, the Plaintiffs are not likely to succeed on the merits of their claims.

Essentially, a prima facie case of disparate impact discrimination involves a threshold showing that some employment practice causes a significant statistical disparity.  See Ricci, 129 S. Ct. at 2677 (citing Connecticut v. Teal, 457 U.S. 440 (1982)).  Next, the burden of production shifts to the defendant, who is given an opportunity to assert that that the practice (1) is required by business necessity, Griggs v. Duke Power Co., 401 U.S. 424, 431(1971), Albemarle Paper Co. v. Moody, 422 U.S. 405, 434-35 (1977), or (2) otherwise significantly furthers the legitimate employment goals of the employer.  Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642, 659 (1989).

---

[9] This Court's observation that striking down the residency requirement might make the NHRFR liable for disparate treatment to the Hispanic Intervenors is preliminary and does not purport to adjudicate the merits of a claim that has not yet been brought.  Such adjudication would be advisory, since it would rule on events that have not yet come to pass.  The NHRFR has not yet taken any action to strike down its residency requirement; to the contrary, it is defending the validity of restricting its DOP list to applicants residing in a Member Municipality.  The interests of the NHRFR and the Intervenors are currently aligned in this litigation.  Thus, any claim by the Hispanic Intervenors against the NHRFR is not ripe for adjudication.

To make out a <u>prima facie</u> case, "it is not enough for a plaintiff to show that there are statistical disparities in the employer's workforce." <u>Foxworth v. Pa. State Police</u>, 228 Fed. App'x 151, 156 (3d Cir. 2007) (unpublished) (internal quotations omitted).  Rather, plaintiffs must prove causation; they must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." <u>Newark Branch, NAACP v. City of Bayonne</u>, 134 F.3d 113, 121 (3d Cir. 1998) (quoting <u>Wards Cove Packing Co., Inc. v. Antonio</u>, 490 U.S. 642, 657 (1989) (internal quotations omitted)).  "To prove causation through statistical evidence alone, the statistics must be 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group . . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.'" <u>Id.</u> (quoting <u>Watson</u>, 487 U.S. at 994-95).

To show causation in the statistical analysis, "[t]he 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market.'" <u>City of Bayonne</u>, 134 F.3d at 121 (quoting <u>Wards Cove</u>, 490 U.S. at 650).

In the February 18, 2009 decision, the Court considered the strength of the Plaintiffs' <u>prima facie</u> case.  The Court noted that "the racial composition of the at-issue jobs is known:  it is undisputed that two out of the 323 employees of the NHRFR are African American." 255 F.R.D. at 390.  Next, the Court considered the definition of the relevant labor market, concluding that since "Dr. Wright's conclusion regarding the relevant labor market is based in sound reasoning, and…NHRFR did not dispute this particular conclusion of Dr. Wright, the court will

18

consider the relevant labor market to be either the Tri-County area or the entire state of New Jersey." Id.

The Court turned to the issue of how to define the qualified population. The Court harmonized the findings of the Plaintiff's and the NHRFR's statisticians, and concluded that both experts' reports supported a finding of discrimination based on a disparate impact from the residency requirement. The Court found that, based on the data provided by either expert, "a significant number of African Americans were added to the DOP lists" when the lists were based on the expanded Tri-County area as opposed to the Member Municipalities Lists. 255 F.R.D. at 391.

The Plaintiffs offered the expert report of Dr. Richard Wright, a professor of Geography whose scholarly work focuses on the operation of labor and housing markets in the United States.[10] Dr. Wright based his analysis on a variety of calculations and estimated the expected number of African Americans in NHRFR's workforce based on: (1) the proportion of African Americans employed in state and local government jobs in Hudson County and the state of New Jersey (Report of Richard Wright, Dec. 29, 2008 ¶ 3.); (2) the proportion of African Americans living in the ten-mile area surrounding Hudson County (Id. ¶ 4.); and (3) the proportion of African Americans employed in full-time protective services work (i.e. police and firefighters) in the Tri-County area and the state of New Jersey (Id. ¶ 5.).[11] See 255 F.R.D. at 386-88. Based on his calculations, Dr. Wright concluded that African Americans "are significantly under-represented" in the NHRFR's work force and he "infer[s] that this likely results from discriminatory hiring practices." Id. at 388 (citing Report of Richard Wright, June 27, 2008 ¶ 15.).

_____

[10] The Court incorporates by reference the more detailed review of Dr. Wright's expert opinion in the February 18, 2009 opinion.

[11] See the February 18, 2009 opinion for charts representing this information.

The NHRFR challenges Dr. Wright's findings on the basis that none of the categories Dr. Wright uses to define "qualified population" are based on the category of firefighter.  Even the category of "protective services" is imprecise, since firefighter is only one of many types of jobs that comprise the "protective services" category.  The NHRFR claims that the protective services category also includes police officers and correctional officers, among others.  (Def.'s Opening Br. 21.)

In the February 18, 2009 opinion, the Court recognized the NHRFR's argument that Dr. Wright's analysis does not control for the likelihood of being qualified for the position of firefighter "as determined by the N.J. D.O.P. process for firefighter eligibility."  255 F.R.D. at 391 (citing Report of Dr. Siskin ¶ 20).  However, the Court was persuaded that Dr. Wright's calculations were not entirely irrelevant, since Dr. Wright did base one of his calculations on the more narrowly tailored "percentage of African Americans in full time protective services in the relevant labor markets."  Id.  The Court summarized Dr. Wright's findings based on the qualified population's definition as "African Americans in full time protective services":

> Dr. Wright calculated that because 37.4% of those employed full time in protective service work in the Tri-county area are African American, one would expect 37.4%, or 121, of the employees of the NHRFR to be African American. In the alternative, because 20% of those employed full time in protective service work in New Jersey are African American, one would expect 20%, or 65, of the employees of the NHRFR to be African American.

Id.

The Court concluded that "[t]he difference between these expected numbers of African Americans - 121 or 65 - and the actual number employed by the NHRFR - 2 - is striking and is sufficiently substantial to raise an inference of causation."  Id.

In response to the Plaintiffs' expert report, NHRFR presented the expert report of Dr. Bernard Siskin, a Director of LECG, LLC, an expert services and consulting firm.[12] Dr. Siskin specializes in the application of statistics to the analysis of employment practices. The Court found that Dr. Siskin's own analyses, when considered in the relevant labor market, further supported an inference of causation. To arrive at this conclusion, the Court examined a set of tables that Dr. Siskin created from the DOP test results. The Court noted that using the DOP test results "obviously accounts for the requirement that the population being compared is 'qualified.'" Id.

Dr. Siskin created new DOP lists (excluding applicants of unknown racial background) based on actual applicants and their scores on the 1999, 2002, and 2006 exams (from data obtained from the DOP), using veteran's status and final average test scores to rank the applicants as they would have been ranked if the residency requirement were changed to Hudson County, the Tri-county area, a five mile radius or a ten mile radius. He calculated the racial breakdown of the applicants in the top 35, top 50, top 65 and top 90 of those lists and also the change vis-a-vis the racial composition of the actual DOP (challenged) lists. The number of African Americans added when the list is expanded from the NHRFR local area to the Tri-County area is:

- On the 1999 list, 12 added in the top 35 (at the expense of 4 whites and 8 Hispanics), 15 added in the top 50 (at the expense of 7 whites and 8 Hispanics), 17 added in the top 65 (at the expense of 7 whites and 10 Hispanics), and 18 added in the top 90 (at the expense of 3 whites and 15 Hispanics)[13]

- On the 2002 list, 8 added in the top 35 (at the expense of 8 Hispanics and the addition of 3 whites), 5 added in the top 50 (at the expense of 6 Hispanics and the addition of 1 white), 8 added in the top 65 (at the expense of 9 Hispanics and the addition of 1 white),

---

[12] The Court incorporates by reference the February 18, 2009 opinion's more detailed review of Dr. Siskin's findings.
[13] See Table 6-1999.

and 10 added in the top 90 (at the expense of 18 Hispanics and with the addition of 8 more whites)[14]

- On the 2006 list, 12 added in the top 35 (at the expense of 10 Hispanics and with the addition of 2 whites), 11 added in the top 50 (at the expense of 7 whites and 5 Hispanics), 12 added in the top 65 (at the expense of 8 whites and 5 Hispanics), and 18 added in the top 90 (at the expense of 10 whites and 10 Hispanics)[15]

Next, Dr. Siskin used the same revised DOP lists based on the expanded geographical regions for the residency requirement but incorporated the assumption that if a non-resident applicant received an appointment elsewhere, he would accept that appointment and not be in competition for a position at NHRFR.  Thus, for the 1999 and the 2002 lists, Dr. Siskin excluded applicants who had been appointed outside of the NHRFR local area while those respective lists were being used.  The resulting number of African Americans added when the list is expanded from the NHRFR local area to the Tri-County area is:

- On the 1999 list, the results were the same as the results in Table 6-1999, detailed above[16]

- On the 2002 list, 10 added in the top 35 (at the expense of 6 Hispanics and with the addition of 1 white), 7 added in the top 50 (at the expense of 1 white and 6 Hispanics), 10 added in the top 65 (at the expense of 11 Hispanics and with the addition of 1 white), and 10 added in the top 90 (at the expense of 17 Hispanics and with the addition of 7 whites)[17]

Finally, Dr. Siskin calculated the expected number of African Americans on the lists in 2006, excluding candidates who had received an appointment elsewhere, but also excluding applicants whose rank on some other list was substantially better than his rank on the new NHRFR list.  Dr. Siskin defined "substantially better" as having a rank order number (where a lower number means a better rank) on the expanded NHRFR list at least twice the best rank order number on another list.  This new assumption drastically changed the 2006 lists.  With the exclusion of

---

[14] See Table 6-2002.
[15] See Table 6-2006.
[16] See Table 8-1999.
[17] See Table 8-2002.

those having a significantly better rank on another list, either zero or only one African American is added to the 2006 lists.[18]  255 F.R.D. at 390.

Since Dr. Siskin's calculations are based on the more closely tailored definition of the qualified population, the Court finds that Dr. Siskin's analyses are more compelling than Dr. Wright's findings based on the category of protective services.  Generally, Dr. Siskin's analysis shows that with the expansion to the Tri-County area, more African Americans would be added to the NHRFR's hiring lists at the expense of both Hispanics and whites, but more often at a greater expense to Hispanics.

The only tables that do not predict any added African Americans are Tables 7-2006 and 8-2006,[19] which exclude applicants who have a "better rank" outside of the NHRFR area. However, when the Court compares the results of Table 8-2006 to Tables 8-1999 and 8-2002, the Court questions whether the assumption underlying Table 8-2006 actually bears out in reality. Since 8-1999 and 8-2002 are based on the actual number of applicants who were hired by another department, the results in those tables are grounded in actual past events.  On the other hand, 8-2006 deleted candidates based on Dr. Siskin's definition of "substantially better" ranking on another list.  The drastic difference between the 8-1999 and 8-2002 Tables and the 8-2006 Table shows that Siskin's assumption that those with a better rank would be hired by another department might not play out so starkly in reality.  On the 8-1999 and 8-2002 Tables, 12 and 8 African Americans were added to the top 35.  On 8-2006, zero African Americans were added to even the top 90.  Further, the difference between 6-1999 and 8-1999, or 6-2002 and 8-2002, shows that controlling for actual outside hiring does not drastically change the results.  In fact, the results for 6-1999 and 8-1999 were unaffected when Dr. Siskin controlled for outside hiring.

---

[18] See Table 8-2006.

[19] Both 7-2006 and 8-2006 are based on the same assumption and differ only in that they represent the population changes from a slightly different perspective.

In contrast, the difference between 6-2006 (18 African Americans added to the top 90) and 8-2006 (zero African Americans added to the top 90) is significant.  This leads the Court to believe that Dr. Siskin's assumption in 8-2006 far over-emphasizes the impact of hiring in other jurisdictions on the number of African American applicants who would be highly ranked on the Tri-County lists.  Moreover, a comparison of Tables 6-2002 and 8-2002 shows that controlling for applicants who were appointed elsewhere in some instances resulted in more blacks, more Hispanics, and less whites.[20]  Since the Tables 8-1999 and 8-2002 are based on more concrete figures than the figures based on a potentially flawed assumption in Table 8-2006, the Court finds that their results are more compelling.

The NHRFR argues that NAACP v. City of Bayonne, 134 F.3d 113, 117 (3d Cir. 1998) dictates that the Court must rely on Table 8-2006 since it "used actual data."  (Def.'s Reply Br. 6.)  In Bayonne, the NAACP filed a Title VII suit challenging Bayonne's residency requirement for hiring police and firefighters, asserting that the requirement unlawfully discriminated against African Americans.  The parties agreed on settlement terms, including that Bayonne would suspend the residency requirement and affirmatively recruit African American applicants.  Id. at 115.  Four years later, when the removal of the residency requirement "failed to increase—and in the case of police officers decreased—the representation of African Americans among its workforce, Bayonne reinstated the residency requirement."  Id.  The NAACP sued for injunctive relief, and the district court found that the NAACP "had failed to establish a causal nexus between the residency requirement and its allegedly disparate impact on African Americans."  Id.  The Court of Appeals upheld the district court's determination, and distinguished Harrison, 940 F.2d 792, from Bayonne on the grounds that:

---

[20] Compare the top 35 and top 90 candidates on 6-2002 and 8-2002.

> [T]he only evidence presented in <u>Harrison</u> were projections based on statistics; here there is direct evidence consisting of hiring percentages of African American applicants during the four years in which Bayonne removed its residency requirement.  Statistics 'are not irrefutable; they come in infinite variety and, like any other evidence, they may be rebutted.  In short, their usefulness depends on all of the surrounding facts and circumstances.'  In Title VII cases, we often rely on statistical evidence because direct evidence of the effect of a particular employment practice is not available….In this case, no projection is necessary because there is direct evidence of the impact of the challenged practice….Faced with the record, we believe that the district court did not commit clear error in finding that the NAACP had failed to prove causation.

<u>Id.</u> at 123 (quoting <u>Int'l Bhd. Of Teamsters v. United States</u>, 431 U.S. 324, 340 (1977)).

The information before the Court is very different from the information that the Court had in <u>Bayonne</u>.  In <u>Bayonne</u>, the Court was presented with actual hiring data from four years without the residency requirement.  Here, the analysis that the NHRFR presents as "actual data" is in actually based on an assumption by Dr. Siskin that the Court finds is flawed and therefore the Court did not rely on it.  The teaching of <u>Bayonne</u> is simply inapposite here, since the Court does not have years of real hiring data without the residency requirement.  The list certified by the DOP after the Court issued the injunction on February 18, 2009, (Kobin Cert. App. 3.), might have provided some guidance, but it does not contain information about the race, ethnicity or national origin of the candidates, so the Court is unable to decipher from it any information about the impact that removing the residency requirement would have on minority hiring at the NHRFR for the 2006 examination.

The NHRFR argues, solely on the basis of Table 8-2006, that "if the residency requirement is removed, Regional will be forced to hire significantly less Hispanics and more Caucasians, with no material increase in African-American representation."  (Def.'s Opening Br. 10.)  Based on the aforementioned flaw in the assumption underlying Table 8-2006 and the contrary results in Tables 8-1999 and 8-2002, the Court cannot accept the NHRFR's conclusory

argument that expanding the list to the Tri-County area would not result in any material increase in African American representation. On the 8-1999 and 8-2002 lists, 12 and 8 African Americans, respectively, were added to the top 35 ranked candidates when the list was expanded to the Tri-County area. That increase is significant.

The NHRFR also asserts, again on the sole basis of 8-2006, that "Plaintiffs have failed to identify even a single African-American who would have been hired by the Regional if there was no residency requirement." (Def.'s Opening Br. 15.) That contention is contradicted by the NHRFR's own expert's analysis. Expanding the residency requirement to the Tri-County area in Tables 6-1999, 6-2002, 6-2006, 8-1999, and 8-2002 added between 8 and 12 African Americans to the top 35 candidates on the lists. The Court concludes, as in the previous opinion, that a significant number of African Americans would have been added to the top ranked candidates on the 1999, 2002 and 2006 lists, had the NHRFR expanded its residency requirement to include the Tri-County area. This finding supports an inference of causation, since the disparity between the qualified population of African Americans in the relevant labor market (as measured by Dr. Siskin's predictions of top-ranked individuals) and the number of African Americans actually employed by the NHRFR is sufficiently substantial. The Court finds a strong basis for its conclusion in the NHRFR's expert's evidence.

The Defendants argue that "Ricci conclusively states that raw statistical data—the very kind that Plaintiffs employed to support their request for a preliminary injunction—does not create a strong basis in evidence of disparate impact liability." (Def.'s Reply Br. 1.) This contention is simply premised on a misreading of Ricci. In Ricci, the Supreme Court instructed that a statistical finding of disparate impact, on its own, did not form a strong basis in evidence that the employer would be subject to disparate impact liability. 129 S. Ct. at 2678. There, the

Supreme Court accepted that the City had made out a prima facie showing of a statistical

disparity.  The Ricci Court found that the City failed to proceed to the next step, which would be

examining whether the practice is "job related for the position in question and consistent with

business necessity."  Id.  This approach comports with Title VII jurisprudence, since under the

traditional burden-shifting framework, after the Plaintiff has made out a prima facie case, the

employer has an opportunity to rebut that showing with the business necessity defense.  Ricci did

not say that statistical data cannot support a prima facie case; rather, Ricci stated that a prima

facie showing, by itself, is not enough to show that the employer will be liable.

     Since the Court has determined that the Plaintiffs are likely to meet their prima facie

showing of disparate impact, the burden shifts to the Defendants to show that the residency

requirement is "job related for the position in question and consistent with business necessity."

Ricci, 129 S. Ct. at 2673.  In the Court's previous opinion, it stated that:

> The NHRFR has not offered any reason that the residency requirement is a
> business necessity and the court is unaware of any reason, particularly given the
> fact that the residency requirement is based only upon an applicant's residence at
> the time he or she takes the exam.  NHRFR employees are free to live wherever
> they choose, so the NHRFR cannot argue that it is interested in its employees
> living close to their place of employment so as to be able to get to work quickly.

255 F.R.D. at 391-92.

     While the employer need not show that a challenged practice is absolutely necessary, it

must demonstrate that the practice furthers legitimate business goals "in a significant way."

Harrison, 940 F.2d at 803 (quoting Wards Cove, 490 U.S. at 659).  Here, the NHRFR must

demonstrate "a nexus between its residency [requirement] and a particular employment goal."

Id. at 804.  Although a "mere insubstantial justification…will not suffice," the NHRFR is not

required to prove the challenged practice is "essential" or "indispensible" to the employer's

business for it to pass muster.  Id. at 801.  The burden of production with regard to the business

necessity defense is on the employer, while the burden of persuasion remains at all times with the plaintiffs.  Id. at 798.

The NHRFR contends that its maintenance of the residency requirement serves a number of business purposes:  avoiding a risk of suit by the Intervenors or some other group of Hispanics; comporting with the goals of the Rodriguez settlement, in which the NHRFR agreed to "reach and attract additional qualified applicants of Hispanic/Latino origin" (Kobin Cert. App. 5.); and correcting past allegations of discrimination and an historic under-representation of Hispanics in the NHRFR.

In Rodriguez, et al. v. North Hudson Regional Fire and Rescue, Civ. No. 01-3153 (filed in this Court), thirteen Hispanic firefighters of Central, South American and Caribbean origin who alleged that they were qualified to compete for lieutenant officer positions, asserted a Title VII claim alleging that the NHRFR's promotion practices disparately impacted firefighters of Hispanic origin.  Paragraph four of the second amended complaint in that case alleged that of approximately 274 firefighters employed by the NHRFR at the time, only 22, or 7%, were Hispanic, and of the approximately 100 lieutenants and other officers in the NHRFR's employ, there were no officers of Hispanic-Latino descent.  The parties eventually settled the matter and accordingly, the Court entered an order dismissing the suit.  The settlement agreement provided for the promotion of four of the plaintiffs to officer positions and for the NHFRF to place advertisements in local Spanish language media giving notice of upcoming examinations, so as to reach and attract qualified applicants of Hispanic origin.  The NHRFR states that it has "complied with its obligation under the Rodriguez settlement and expanded the number of Hispanic firefighters."  (Def.'s Opening Br. 6.)  When the NHRFR hired new firefighters

between July 1, 2007 and October 2007 (the last time the NHFRF hired), 38% of the new hires were Hispanic.  (Id.)

      The residency requirement is not addressed in the Rodriguez settlement, so the NHRFR cannot contend that it would be directly violating the agreement's terms if it were to do away with the residency requirement.  However, expanding the residency requirement would contradict the principles underlying the Rodriguez settlement, which was fashioned to remedy alleged past discrimination and to increase the number of qualified Hispanic firefighter applicants.  Reducing the number of Hispanics in the NHRFR's top-ranked applicant pool would be counterproductive to the NHRFR's goal of recruiting more Hispanics and would dilute the accomplishments of the settlement agreement.  Avoiding dilution of the settlement agreement's goals provides the NHFRF with a business justification for resisting expansion of its residency requirement.  Additionally, averting potential future liability to other groups of Hispanics is another substantial business justification, since the expense of additional litigation could cost the NHRFR significant sums of money.

      The Intervenors argue that in light of the fact that the Member Municipalities have a large Hispanic population, it is important that Hispanics are well represented in the NHRFR workforce so that the NHRFR's protective services workers can better communicate with the population they serve.  Additionally, having Hispanics in the NHRFR workforce will foster the community's trust and pride in the NHRFR:  "a firefighter is a respected member of the community…. [and the] Hispanic residents will take pride in seeing other Hispanics saving lives and performing such a vital service in their communities."  (Int.-Def.'s Reply Br. 13.)

      In Harrison, the employer set forth a business necessity justification that sounded in a similar vein.  It stated that there were loyalty-related advantages to having firefighters who reside

in the community, so that, for example, they would be more likely to participate in local

programs outside of work.  The Court of Appeals stated, "[w]hile employee participation in local

programs was a plus factor, this participation was not sufficiently substantial to justify the

discriminatory effect of the residency requirement."  940 F.2d at 805.

This case differs from <u>Harrison</u> in two important ways.  First, in <u>Harrison</u>, the Court was

faced with a largely white area surrounded by communities that have significant black

populations; as a result of the residency requirement, the Town of Harrison had never hired a

black person.  The Court weighed the asserted loyalty justification in <u>Harrison</u> against "practices

which have had a significant discriminatory effect which have prevented the Town from ever

employing a black person" and found that the loyalty justification paled in comparison.  <u>Id.</u> at

805.  Here, the community in the NHRFR is actually diverse and has a significant Hispanic

population.  Although the Plaintiffs have shown that a significant number of African Americans

would be hired but for the residency requirement, the statistical showing of disparate impact is

less stark than the showing the <u>Harrison</u> plaintiffs made.

Second, the Intervenors' argument differs in an even more compelling manner from the

loyalty argument presented in <u>Harrison</u>.  Here, the Intervenors are arguing that having Hispanic

firefighters serve a majority Hispanic, and often Spanish-speaking population fosters

communication between the NHRFR and the community.  Additionally, it fosters trust between

the community and the population.  This enhanced communication is a more substantial business

justification than the participation of firefighters in community programs, which the Court of

Appeals found was too nebulous a justification in <u>Harrison</u>.  <u>Id.</u>

The Court stated in its previous opinion that the NHRFR "cannot argue that it is

interested in its employees living close to their place of employment so as to be able to get to

work quickly," since the residency requirement is "based only upon an applicant's residence at the time he or she takes the exam."  255 F.R.D. at 391-92.  However, the Court recognizes that the residency requirement does increase the probability that a firefighter will live in the community.  This increased probability ensures more firefighters will be able to report to work more quickly in the case of an emergency.  The Court of Appeals has recognized that emergency-preparedness is a sound business justification for a firefighter residency requirement. Although in Harrison the Court of Appeals found that there were other means to achieve the goal of having a work force that lives in a reasonable distance from the area—to expand the residency requirement to include areas close enough that firefighters could still respond quickly—the Court of Appeals did not find that justification was insubstantial.  940 F.2d at 805.

The Defendants have shown that this case differs in some important regards from past cases in which the Court of Appeals and this Court found that there was no business justification for a residency requirement.  These justifications—the avoidance of more costly litigation, the fostering of communication between protective services workers and the community they serve, and the increased probability of having workers able to respond quickly in the case of an emergency—cast doubt on the Plaintiffs' likelihood of success on the merits in this case.

### ii.      Irreparable Harm to the Moving Party

The Plaintiffs assert that on remand, the Court should only reconsider the first factor— likelihood of success on the merits—of its decision to grant the preliminary injunction, since the Court of Appeals's mandate "said nothing about reconsidering the other preliminary injunction factors."  (Pl.'s Reply Br. 4.)  The Court of Appeals expressly remanded this matter "for consideration and analysis of Ricci and further proceedings consistent with this opinion."  The remand did not restrict the Court's analysis to any single factor in its determination to grant a

31

preliminary injunction.  Rather, the Court of Appeals broadly instructed the Court to apply <u>Ricci</u>

to its factual and legal analysis.  Therefore, in light of the broad mandate from the Court of

Appeals and the fact that a preliminary injunction is an extraordinary equitable remedy which the

district court has discretion to grant or deny, the Court will reexamine each of the four factors

governing its determination to issue the preliminary injunction.  The Court will reconsider these

factors in light of <u>Ricci</u>, new evidence presented by the Intevenors (who were not party to the

previous motion), and new evidence based on any other circumstances which may have changed

since the Court granted the injunction on February 18, 2009.

The Plaintiffs cite <u>Christianson v. Colt Indust. Operating Corp.</u>, 486 U.S. 800, 816

(1988), which states that "when a court decides upon a rule of law, that decision should continue

to govern the same issues in subsequent stages in the same case."  However, the findings of fact

and conclusions of law in a ruling on a preliminary injunction are naturally preliminary in nature

and thus do not foreclose any findings or conclusions to the contrary in subsequent stages of the

litigation.  <u>See</u> <u>Oburn v. Shapp</u>, 521 F.2d 142, 149 n. 18 (3d Cir. 1975).  Furthermore, the Court

is not presented with a rigid test here; a preliminary injunction is an equitable remedy, which the

Court, in its discretion, considers by balancing and weighing the various factors against one

another.  Finally, the issuance of <u>Ricci</u> is not the only change in circumstances since the Court

first considered the Plaintiff's application for a preliminary injunction; the intervention in this

suit by the group of Hispanic firefighter candidates is another obvious changed circumstance that

must factor into the Court's weighing of the equities.

With all that in mind, the Court will reconsider whether the Plaintiffs would suffer

irreparable harm without the injunction.  "Before granting a preliminary injunction, a district

court must consider the extent to which the moving party will suffer irreparable harm without

injunctive relief."  Novartis v. Consumer Health, Inc. v. Johnson & Johnson-Merck, 290 F.3d

578 (3d Cir. 2002).  "The irreparable harm requirement is met if a plaintiff demonstrates a

significant risk that he or she will experience harm that cannot adequately be compensated after

the fact by monetary damages."  Adams v. Freedom Forge Corp., 204 F.3d 475, 485 (3d Cir.

2000).  The risk of irreparable harm must not be speculative.  Id. at 488.  While all four factors

are important, failure to show either likelihood of success on the merits or irreparable harm

"must necessarily result in denial of a preliminary injunction."  In re Arthur Treacher's Franchisee

Litigation, 689 F.2d 1137, 1143 (3d Cir. 1982).

In the Court's previous opinion, the Court considered this element in the following

manner:

> The Plaintiffs claim that they will be irreparably harmed if NHRFR hires any new
> firefighters during the pendency of this litigation because those hires will gain
> training, experience and seniority while the Plaintiffs are not eligible to be
> considered for any open positions because they are not on the NHRFR's DOP list.
> The NHRFR argues that, "if the Plaintiffs prevail, their hiring date may be
> retroactively set for seniority purposes through the DOP," and that "[t]raining and
> experience may also be remediated by additional training if the Plaintiffs
> ultimately succeed."  (Def.'s Opp'n Letter Br. at 9.)  While the problem of
> seniority could be fixed, the lost training and experience would be harder, if not
> impossible, to compensate.  Additional training could make up for some of the
> lost training, but there is a practical limit on the amount of additional training that
> a person can receive in a given amount of time.  Thus, it could take months or
> years to make up for the training lost during the pendency of this litigation.
> Further, the actual experience lost could not be regained.  Additional training
> cannot adequately substitute for on-the-job experience.  Thus, the Plaintiffs have
> proven irreparable harm.

255 F.R.D. at 392.

In short, the Court concluded that the Plaintiffs would be irreparably harmed by the loss

of training and experience, while seniority and lost pay would not constitute irreparable harm,

since both could be remedied if the Plaintiffs ultimately prevailed.

The Defendants point to one aspect of this inquiry that the Court did not previously consider; that is, whether any of the plaintiffs or plaintiff class members would actually be considered for employment if the NHRFR were to hire from the 2006 Tri-County List.  Dr. Siskin's Tables 7-2006 and 8-2006 predict that no additional African Americans would be ranked within even the top 90 candidates on a list incorporating residents of the Tri-County area. However, as the Court explained in detail above, Tables 7-2006 and 8-2006 are based on a questionable assumption.  Dr. Siskin's own Table 5-2006 and 6-2006 predict that a number of African Americans would be highly ranked on a Tri-County DOP list based on the 2006 examinations.

The Defendants argue that the named Plaintiffs are not currently even eligible to be hired since they did not take the 2006 examination.  The Court has certified this case as a class action, so the eligibility of the named Plaintiffs to be hired from a 2006 list does not, on its own, prohibit the Court from finding that the Plaintiffs as a class would suffer harm without the injunction. The Court finds that some of the Plaintiff class members would suffer irreparable harm without the injunction, in the form of lost training and experience.

### iii.    Harm to the Non-moving Party

In the Court's previous decision, it did not consider the irreparable harm to Hispanic applicants on the 2006 list.  The Court instead focused only on the NHRFR's risk of irreparable harm.  The Court concluded that the risk of harm of which the NHRFR complained—an effective hiring freeze—was not irreparable, since the injunction allowed the NHRFR to hire from a Tri-County List, which the DOP could produce within two weeks.

> Plaintiffs claim that the hiring freeze they seek would not harm the NHRFR because it has other alternatives, such as paying overtime to current employees. NHRFR responds that it provides emergency fire suppression and rescue services to one of the most densely populated parts of the country, and if its ability to hire

more protective service workers is taken away, it threatens the critical public safety function served by the NHRFR.  NHRFR submitted the certification of Jeffrey Welz, Executive Director of Administration for the NHRFR, in which Mr. Welz explained that the NHRFR has a critical need for additional firefighters and a civilian employee.  Given the crucial public safety function provided by the NHRFR, and its current needs, as detailed in Mr. Welz's declaration, it would cause great harm to the NHRFR to impose the injunction requested by the Plaintiffs – a hiring freeze.  However, an order to enjoin the NHRFR from hiring candidates from its current DOP list until it obtains a list from the DOP that includes residents of all of Hudson, Essex, and Union counties would not cause the same harm.  Mr. Welz explained that when the NHRFR begins its hiring process, it requests a certification of candidates from the DOP, which it expects to receive within two weeks of the request.  Thus, the NHRFR could quickly inform the DOP of the change in the residency requirement for applicants to be certified to its list and could then begin its new hiring process within two weeks.

255 F.R.D. at 392.

The Court fashioned its remedy so that the NHRFR would not be absolutely required to institute a total hiring freeze.  Thus, the preliminary injunction, as issued, could have nullified much of the risk of harm complained of by the NHRFR.  The NHRFR could have hired from the Tri-County DOP list, which the DOP issued even though the NHRFR did not request it. However, the NHRFR has treated the injunction as a de facto hiring freeze mandate.  The NHRFR claims that it has not hired from the Tri-County list because hiring from the Tri-County List would (1) evade the Rodriguez settlement, and (2) expose the NHRFR to disparate impact or treatment liability to the Intervenors or another Hispanic group.

The NHRFR states that because it was enjoined from hiring from its Member Municipality list and prefers not to hire from the Tri-County List, it has suffered all of the harms that come with a hiring freeze, including soaring overtime costs, partial closure of certain firehouses, reduction in the number of fire trucks in service at a given time, and reduction in the number of firefighters in each truck.  Additionally, the Court previously noted that the NHRFR could begin its hiring process within two weeks of requesting a list from the DOP.  The NHRFR

asserts, to the contrary, that the entire hiring process often consumes four months of time, from the date on which the decision to hire is made, to the day probationary firefighters are on the line and available to fight fires.  (Welz Cert. ¶ 29.)

After this Court's first decision, the Court granted the Intervenors' motion to intervene in this suit.  The Intervenors' interests should be taken into account, not only based on their current status as a party to this litigation, but also as an interested third party.  The Court of Appeals takes into account the possibility of harm to other interested persons from the grant or denial of the injunction.  See Spartacus v. Borough of McKees Rocks, 694 F.2d 947, 949 (3d Cir. 1982); (Oburn v. Shapp, 521 F.2d 142, 152 (3d Cir. 1975) (citing Delaware River Port Auth. V. Transamerican Trailer Transp, Inc., 501 F.2d 917, 924 (3d Cir. 1974)).

The Court finds that the injunction causes at least an equal risk of irreparable harm to the Intervenors, and at worst, a greater risk of harm.

The NHRFR argues that "[t]here is no basis or legal support to favor African-American interests over Hispanic interests when the harm is equal."  (Def.'s Opening Br. 15.)  This argument is premised on the fact that the injunction forbids the Court to hire from the Member Municipalities List.  On that list, because the Intervenors earned high rankings, it is likely that many of them would have been hired and been working for nearly a year had it not been for the injunction.[21]  Additionally, if the NHRFR had hired from the Tri-County List as provided for in the injunction, they would be much less likely to be hired at all, since their ranking would drop significantly.[22]

---

[21] The Intervenors earned the following scores on the 2006 DOP examination:  Claro (93.07 percent), Vasquez (91.84 percent), DeRojas (91.65 percent), Duque (89.86 percent), Castillo (89.68 percent), and Rodriguez (88.3 percent).

[22] If the NHRFR hired from the Tri-County list as opposed to the Member Municipality list, the Intervenors' ranking on the respective lists would change as follows:  Claro's rank would drop from 21 to 189, Vasquez's rank would drop from 25 to 261, DeRojas's rank would fall from 26

Additionally, the Intervenors, as residents of the Member Municipalities suffer additional harm in terms of training and experience that the Plaintiffs do not suffer.[23]  During the pendency of the preliminary injunction, the Intervenors have applied for firefighter positions in Hillside, Plainfield, Elizabeth, Newark, Irvington, and East Orange and were rebuffed based on residency requirements employed there.  (Kobin Cert. App. 11.)  In contrast, as the Intervenors point out, the "Plaintiffs were free to obtain positions elsewhere and gain both experience and training while this litigation was ongoing…[while the] Intervenors have been precluded from being hired by both the NHRFR and other fire departments."  (Int-Def.'s Br 15.)

Additionally, consent decrees in some jurisdictions, such as "Atlantic City, East Orange, Elizabeth, Hoboken, Jersey City, New Brunswick, Newark, Passaic, Paterson, Plainfield, and Trenton" require the various fire departments "to provide additional test instruction and training to their potential firefighter candidates to increase their civil service test scores."  (Def.'s Reply Br. 4)  Thus, the Plaintiffs have an additional avenue to garner experience and training while the case is pending that the Intervenors do not have.

Finally, soon all DOP lists based on the 2006 examination will expire, and the Intervenors will have to study and take the test again to be eligible for hiring.

---

to 292, and the remaining Intervenors—Castillo (ranked 45th on the Member Municipality List), Duque (ranked 49th on the Member Municipality List), and Rodriguez (ranked 70th on the Member Municipality List)—would not be ranked within the top 400 candidates on the Tri-County List.

[23] The Court is aware that Harrison, 940 F.2d at 801, instructs that the employment practices of other employers are not relevant to the disparate impact analysis.  There, this Court of Appeals held that the residency requirements of other municipalities do not bear on appropriate definition of the relevant labor market.  However, here the Court takes notice of the employment practices of surrounding employers for the purpose of its irreparable harm analysis, since as a practical matter, it is clear that during the pendency of the injunction, the Intervenors have been unable to seek employment in other municipalities because of the residency requirements there, while the Plaintiffs could seek employment in their home municipalities in order to gain some training and experience.

The Court finds that the Intervenors face a greater risk of irreparable harm in comparison with the Plaintiffs, since the Plaintiffs have more opportunities to obtain training and experience while awaiting the Court's decision on the merits.  The Court cannot grant the Plaintiffs preliminary relief when it will result in greater harm to a nonmoving party.

### iv.   Public Interest

In the February 18, 2009 decision, the Court reasoned that:

> …[T]he public interest would be harmed if the NHRFR were not able to hire the employees it needs to carry out its task of providing emergency fire suppression and rescue services in the Member Municipalities.  Thus, it would not be in the public interest to impose a simple hiring freeze on the NHRFR.  The public interest is also served, of course, by not allowing discriminatory hiring practices, so the proper balance of the competing interests is satisfied by an order to enjoin the NHRFR from hiring candidates from its current DOP list and to commence hiring only when it obtains a list from the DOP that includes residents of all of Hudson, Essex and Union counties.

255 F.R.D. at 392.

The Court maintains its previous assertion that the public interest is served by not allowing discriminatory hiring practices.  However, the Court is not presented with such a simple issue after the intervention of the group of Hispanic applicants.  Now, the Court is faced with hiring practices that may cause disparate impact to one minority group, but that benefit another minority group.  Furthermore, the goals underpinning the Rodriguez settlement agreement are served by the residency requirement.  This aspect of the public interest analysis does not provide the Court with a clear mandate.

The Court's first opinion attempted to avoid imposing a hiring freeze on the NHRFR, since the public interest would be harmed if the NHRFR were not able to hire the employees it needs to provide effective emergency fire suppression and rescue services in the Member Municipalities.  However, the NHRFR's concern that it may be liable to the Intervenors or some

other group of adversely impacted Hispanic applicants if it hires from the Tri-County List has rendered the injunction an effective hiring freeze and the public interest in keeping the NHRFR staffed has been suffered.

The shortage of NRHFR firefighters has also negatively impacted upon the fire departments of surrounding communities, including Jersey City, Bayonne, and Harrison, with which the NHRFR has agreements to provide mutual assistance.  Based on its diminished workforce, the NHRFR has to draw on the mutual assistance of its neighboring communities' firehouses for instances when simultaneous fires occur in the NHRFR or when one fire is elevated to a certain alarm level.  The NHRFR claims that its increased use of mutual aid harms its neighbors' fire departments in two  manners:  first, by exposing their firefighters and equipment to more emergency responses than they would normally have, thereby exposing them to additional threat of harm, and second, by reducing the ability of the neighboring departments to respond to emergencies in their own municipalities.

### III.  CONCLUSION

Based on all of these factors, the Court finds that the equities weigh in favor of vacating the preliminary injunction.  The Court will enter an order implementing this opinion.


**s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: April 23, 2010