<u>FOR PUBLICATION</u>

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
("NAACP"); the NEWARK BRANCH, NAACP; the
NEW JERSEY STATE CONFERENCE NAACP;          Civ. No. 07-1683 (DRD)
ALLEN WALLACE; LAMARA WAPPLES; and
ALTARIK WHITE,                                    **O P I N I O N**

            Plaintiffs,

    v.

NORTH HUDSON REGIONAL FIRE & RESCUE, a
body corporate and politic of the State of New Jersey,

          Defendant,

    v.

ALEX M. DeROJAS, RANDY VASQUEZ, CARLOS
CASTILLO, ORLANDO DUQUE, PABLO CLARO,

          Intervenor-Defendants.

Appearances:

RABNER, ALLCORN, BAUMGART & BEN-ASHER, PC
By: Eugenie F. Temmler, Esq.
52 Upper Montclair Plaza
PO BOX 43416
UPPER MONTCLAIR, NJ 07043

ROSE & ROSE, PC
By: David L. Rose, Esq.
    Joshua N. Rose, Esq.
1320 19th Street NW, Suite 601
Washington, DC 20036

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

By: Angela Ciccolo, Esq.
    Anson Asaka, Esq.
4805 Mt. Hope Drive
Baltimore, MD 21215

    *Attorneys for Plaintiffs*

CHASAN, LEYNER & LAMPARELLO, PC
By: Thomas R. Kobin, Esq.
    Joseph A. Lagana, Esq.
300 Harmon Meadow Boulevard
Secaucus, NJ 07094

    *Attorneys for Defendant*

The Corrigan Law Firm
By: David F. Corrigan, Esq.
    Bradley D. Tishman, Esq.

    *Attorneys for Intervenor-Defendants*

**<u>DEBEVOISE, Senior District Judge</u>**

    This suit is a disparate impact challenge to a consolidated municipal fire department, the

North Hudson Regional Fire and Rescue's ("NHRFR") use of residency requirements for hiring.

Plaintiffs, the National Association for the Advancement of Colored People ("NAACP"), the

Newark Branch of the NAACP, the New Jersey State Conference of the NAACP, Allen Wallace,

Lamara Wapples, and Altarik White[1] (collectively, "Plaintiffs") filed this action on April 10,

2007 against the NHRFR pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

1981, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to -49.[2]  On February

18, 2009, the Court granted the Plaintiffs' motions for class certification and issued a preliminary

injunction, barring the NHRFR from hiring from its current eligibility list until it obtained a list

that expanded the residency requirement to include residents of nearby Essex and Union

---

[1] Plaintiff Keith Reeves has been dismissed from the case.
[2] This opinion is confined to discussion of the Plaintiffs' Title VII claim because the state law claim is analyzed in essentially the same way as the federal claim.  <u>Gerety v. Atlantic City Hilton Casino Resort</u>, 184 N.J. 391, 398 (2005).

Counties and the southern part of Hudson County.  The NHRFR filed an interlocutory appeal

challenging the portion of this Court's decision that granted the preliminary injunction.  On

September 21, 2009, while the appeal was pending, the Court granted a motion to intervene filed

by six Hispanic firefighter candidates who were on the list from which the injunction prohibited

the NHRFR to hire.  On March 1, 2010, the Court of Appeals for the Third Circuit <u>sua</u> <u>sponte</u>

summarily remanded the matter to the District Court, for further proceedings in light of the

Supreme Court's recent decision in <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658 (2009).  On April 23,

2010, the Court vacated the injunction, making a preliminary finding that the residency

requirement might further the NHRFR's business goals and that the balance of the equitable

factors weighed towards vacating the injunction.  On June 29 and 30, 2010, Plaintiffs,

Defendants, and Intervenor-Defendants each filed separate motions for summary judgment,

pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs move for an adjudication of their

disparate impact case on the merits, and to permanently enjoin the NHRFR from using the

residents-only list for hiring.  The NHRFR moves for summary judgment dismissing Plaintiffs'

claims for failure to establish causation and because the NHRFR claims to have asserted a valid

business necessity defense.  Intervenors argue that <u>Ricci</u> provides the Defendants with a defense

to the Plaintiffs' disparate impact claim, and seek a judgment that they are entitled to attorneys'

fees as a "prevailing party" for their role in the Court's April 23, 2010 vacation of the

preliminary injunction.  For the reasons described below, the Court will grant the Plaintiffs'

motion for summary judgment and grant the Plaintiffs' request for a permanent injunction.

Accordingly, the Court will deny the NHRFR's and the Intervenors' motions for summary

judgment on the merits of the Plaintiffs' claims.  The Court will also deny the Intervenors'

motion for the assessment of attorneys' fees against the Plaintiffs for the Intervenors' role in the Court's April 2010 vacation of the preliminary injunction.

## I.      BACKGROUND

The NHRFR is a consolidated municipal fire department and political subdivision of the State of New Jersey that serves several communities in North Hudson County.  The NHRFR was formed in 1998 in accordance with the Consolidated Municipal Services Act, N.J. Stat. Ann. 40:48B-1, et. seq., and is essentially a consolidation of the former fire departments of Guttenberg, North Bergen, Union City, Weehawken and West New York (collectively, the "Member Municipalities").

In New Jersey, civil service positions such as firefighter are subject to the examination process administered by the New Jersey Department of Personnel ("DOP").  N.J.A.C. 4A:4-1.1. The NHRFR is subject to the New Jersey Civil Service Act, N.J. Stat. Ann. 11A:1-1, et seq., and the rules and regulations promulgated thereunder.  See N.J.A.C. 4A:1-1 et seq.  As such, to be hired by the NHRFR, a person must apply for and take an examination administered by the DOP. The DOP controls all aspects of the examination, from scheduling to content and scoring. Recently, the DOP administered the firefighter examination in 1999, 2002, 2003, and 2006.  A new examination was recently announced and should generate a new list for hiring in 2011. Those who take the examination at the same time are ranked on a list based on their test scores on the written, and, sometimes, physical examinations.  Based on these scores, the DOP creates eligibility lists from which organizations subject to the New Jersey Civil Service Act, such as the NHRFR, may hire candidates in rank order.  N.J.A.C. 4A:4-3.1 & 3.2.  When the NHRFR needs to fill a vacancy, it offers the position to the highest ranked person(s) on the list provided to it by the DOP.  Passing the DOP test, however, is not the only requirement for inclusion on the

NHRFR's list.  In order to be placed on the NHRFR's list, a candidate must also live in the Member Municipalities at the time he or she took the test.  If the applicant does not live in the Member Municipalities at the time of the administration of the examination, her name will not be placed on the NHRFR's list and, thus, the candidate will not be eligible to be hired by the NHRFR, no matter how high her test score.

The Civil Service regulations authorize the use of residency requirements by municipalities and regionals.  N.J.A.C. 4A:4-2.11.  Consequently, a number of other municipalities, including Atlantic City, Camden, East Orange, Elizabeth, Hoboken, Jersey City, New Brunswick, Newark, Passaic, Paterson, Camden, East Orange, and Trenton, all employ residency requirements.

As of July 2008, according to the NHRFR's EEO-4 form, the NHRFR had 323 full time employees.  Of those employees, two were African American, 64 were Hispanic, 255 were white and two identified as other races.[3]  Of the NHRFR's 323 full time employees, 302 were firefighters.  Of these, two were African American, 58 were Hispanic and 240 were white.  In 2000, the population of the Member Municipalities was 69.6 percent Hispanic, 22.9 percent white non-Hispanic, and 3.4 percent African American.

The Complaint, filed April 10, 2007 against the NHRFR pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to -49, alleges that the NHRFR's geography-based hiring plan causes discrimination against African Americans who reside in the southern part of Hudson County and neighboring Essex and Union counties.

---

[3] The parties use the terms "African American," "Hispanic," and "white" in their submissions, and the Court adopts the parties' terminology.

On February 18, 2009, the Court granted the Plaintiffs' motions for class certification and issued a preliminary injunction. The Court certified the class as follows:

> African Americans who reside or resided in any municipality in Essex, Union, or Southern Hudson County, and who sought or are seeking employment as firefighters or others in positions for which North Hudson Regional Fire & Rescue hires and who have taken and passed an examination where the Department of Personnel requires such an examination.

(February 18, 2009 Order.)

The Court found that the NHRFR had a likelihood of success on the merits of its Title VII disparate impact discrimination claim and issued the preliminary injunction, barring the NHRFR "from hiring candidates from its current DOP list[4] and from commencing hiring candidates until it obtains a list from the DOP that expands the residency requirement to include residents of Hudson, Essex, and Union counties[5]." North Hudson, 255 F.R.D. at 393.

The NHRFR filed an interlocutory appeal challenging the portion of this Court's decision that granted the preliminary injunction. On August 12, 2009, Intervenors Alex DeRojas, Alexander Rodriguez, Randy Vasquez, Carlos A. Castillo, and Orlando Duque ("Intervenors") filed a third party motion to intervene. Each of the Intervenors is a resident of a Member Municipality and is of Hispanic descent. In 2006, after months of preparation, each of the Intervenors sat for the DOP firefighter examination and earned high scores. On the Member Municipalities List, the Intervenors were ranked at 21, 25, 26, 45, 49, and 70, based on their respective test scores, and other factors, such as veteran status (none of the Intervenors are veterans). Since the NHRFR currently needs to hire approximately 35 to 40 new firefighters, the Intervenors argued that it was likely they would have been hired, had the injunction not barred

---

[4] Hereinafter referred to as the "Member Municipalities List."
[5] Hereinafter referred to as the "Tri-County List."

the NHRFR from hiring from the Member Municipalities List. [6]  If the NHRFR were to hire from

the Tri-county List, the Intervenors would effectively lose their chance to be hired, since their

rankings would be significantly altered; for instance, the candidate who was ranked in 21st place

on the Member Municipalities List would be ranked at 189th place on the Tri-county List, and so

forth. [7]  The Intervenors' stated reason for joining the suit was to challenge the preliminary

injunction, which they claimed eroded their prospects for employment with the NHRFR.  The

Court heard oral arguments on the motion to intervene on September 21, 2009 and granted the

motion with an oral opinion from the bench.

On March 1, 2010, the Court of Appeals for the Third Circuit sua sponte summarily

remanded the matter to the District Court, for further proceedings in light of the Supreme Court's

recent decision in Ricci v. DeStefano, 129 S. Ct. 2658 (2009).  On April 23, 2010, the Court

vacated the injunction, making a preliminary finding that the residency requirement might

further the NHRFR's business goals and that the balance of the equitable factors weighed

towards vacating the injunction.  On June 29 and 30, 2010, Plaintiffs, Defendants, and

Intervenors filed the three motions for summary judgment that are presently before the Court.

## II.       DISCUSSION

### A.       Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For

---

[6] The Intervenors earned the following scores on the 2006 DOP examination:  Claro (93.07 percent), Vasquez (91.84 percent), DeRojas (91.65 percent), Duque (89.86 percent), Castillo (89.68 percent), and Rodriguez (88.3 percent).
[7] The Intervenors' ranking on the respective lists would change as follows:  Claro's rank would drop from 21 to 189, Vasquez's rank would drop from 25 to 261, DeRojas's rank would fall from 26 to 292, and the remaining Intervenors—Castillo (ranked 45th on the Member Municipality List), Duque (ranked 49th on the Member Municipality List), and Rodriguez (ranked 70th on the Member Municipality List)—would not be ranked within the top 400 candidates on the Tri-County List.

an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

## B.    Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on the merits of their disparate impact claim, asserting that (1) they have met their prima facie burden by showing that the NHRFR's residency

requirement causes a disparate impact; (2) the NHRFR was unable to meet its burden of proving

the residency requirement's job-relatedness for the position in question and consistency with

business necessity; and (3) in the alternative, less discriminatory alternative employment

practices could meet any of the business goals the NHRFR cites.  Finally, the Plaintiffs move for

summary judgment that they are entitled to an order permanently enjoining the NHRFR from

using its residents-only requirement as a condition of employment.

The Court will pause briefly before considering the merits of Plaintiffs' motion to address

a procedural argument raised by the NHRFR.  The NHRFR asserts that the Plaintiffs' "attempt to

circumvent motion for reconsideration rules and an appeal of the Courts [sic] prior

determinations" are "procedurally and meritoriously deficient."  The Court is not persuaded that

the Plaintiff's motion is somehow procedurally deficient.  The Court will consider the merits of

the motion.

Under Title VII, it is unlawful for an employer "to limit, segregate or classify his

employees or applicants for employment in any way which would deprive or tend to deprive any

individual of employment opportunities . . . because of such individual's race, color, religion,

sex, or national origin."  42 U.S.C. § 2002e-2(a)(2).  Title VII prohibits both intentional

discrimination and "disparate impact" discrimination, i.e., "employment practices adopted

without a deliberately discriminatory motive, [which] may in operation be functionally

equivalent to intentional discrimination."  Newark Branch, NAACP v. City of Bayonne, 134

F.3d 113, 121 (3d Cir. 1998) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987

(1988) (internal quotations omitted)).  The prohibitions under Title VII extend to practices that

have a discriminatory impact, regardless of the employer's intent in implementing or carrying

out those practices, unless the employer shows that the practice is required by business necessity.

Griggs v. Duke Power Co., 401 U.S. 424, 431(1971); Albemarle Paper Co. v. Moody, 422 U.S. 405, 434-35 (1977).

Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Id. "Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." Ricci, 129 S. Ct. at 2673 (citing 42 U.S.C. 2000e-2(k)(1)(A)(ii) and (C)).

> i.    *Prima Facie Evidence of Discrimination*

Essentially, a prima facie case of disparate impact discrimination involves a threshold showing that some employment practice causes a significant statistical disparity, or has the effect of denying members of one race equal employment opportunities. See Ricci, 129 S. Ct. at 2677 (citing Connecticut v. Teal, 457 U.S. 440, 450 (1982)).

To make out a prima facie case, "it is not enough for a plaintiff to show that there are statistical disparities in the employer's workforce." Foxworth v. Pa. State Police, 228 Fed. App'x 151, 156 (3d Cir. 2007) (unpublished) (internal quotations omitted). Rather, plaintiffs must prove causation; they must "demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites." Bayonne, 134 F.3d at 121 (quoting Wards Cove, 490 U.S. at 657

(internal quotations omitted)).  "To prove causation through statistical evidence alone, the statistics must be 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group . . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation.'"  Id. (quoting Watson, 487 U.S. at 994-95).  To show causation in the statistical analysis, "[t]he 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified . . . population in the relevant labor market.'"  City of Bayonne, 134 F.3d at 121 (quoting Wards Cove, 490 U.S. at 650).

### a.    Dr. Wright's Expert Report

To establish a prima facie case of disparate impact, the Plaintiffs present the expert report of Dr. Richard Wright, a professor of Geography whose scholarly work focuses on the operation of labor and housing markets in the United States.  First, Dr. Wright states that, based on his study of patterns of employment in the United States in private sector and public sector jobs, he has "found that African Americans generally have a disproportionately high interest in, and availability and qualification for, employment in the public sector as compared to the private sector."  (Report of Richard Wright, June 27, 2008, ¶ 2.)  To support this assertion, Dr. Wright offered the following data developed by the United States Equal Employment Opportunity Commission ("EEOC") from its 2005 EEOC - 4 reports.  The chart below compares the percentage of employees in state and local government who are African American versus the percentage of employees in the private sector who are African American:

|  | U.S. as a Whole | New Jersey |
|---|---|---|
| Employment of African Americans in State & Local Government | 18% of total employment | 23.8% of total employment |

| Employment of African Americans in Municipal Protective Service Jobs (mostly police officers and fire fighters) | 17.6% of total employment | 20.0% of total employment |
|---|---|---|
| Employment of African Americans in the Private Sector | 14.1% of total employment | 15.3% of total employment |

(Id. ¶ 3.)

Based on this data, Dr. Wright asserts that, in the United States as a whole as of 2005, African Americans were 1.34 times more likely to work in state and local government than in the private sector.  (Id.)  In New Jersey, as of 2005, African Americans were 1.56 times more likely to work in state and local government than in the private sector.  NHRFR's expert, Dr. Bernard Siskin, agrees with Dr. Wright's assertion that African Americans generally have a disproportionately high interest in and availability for employment in the public sector as compared to the private sector, but disagrees that African Americans have disproportionately high qualifications for employment as police and firefighters.  (Report of Bernard Siskin, Nov. 18, 2008, ¶ 18.)

Next, Dr. Wright compared the proportion of African Americans in full time state and local government in both Hudson County and New Jersey with the proportion of African Americans employed by the NHRFR,[6] and calculated an expected number of African Americans to be employed by the NHRFR using the percentage of African Americans in full time state and

_____

[6]Dr. Wright's first report used EEO-4 data from 2006, which showed that 1 of 308 of NHRFR's full time employees were African American.  Dr. Wright's second report (in response to Dr. Siskin's report), dated Dec. 29, 2008, used EEO-4 data from 2008, which showed that 2 of 323 of NHRFR's full time employees were African American.  This opinion discusses the calculations in Dr. Wright's second report because it is based on more recent data and on the same data used by Dr. Siskin.  Dr. Wright's numerical results changed very little with the substitution of the data from 2008, and Dr. Wright's conclusions in both reports are the same.

local government as a basis.  The NHRFR has 323 full time employees, two of whom are African American.

|  | Proportion of AAs Employed in State & Local Government | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
|---|---|---|---|
| Hudson Co. | 12% | 39 (12% of 323) | 6 standard deviations |
| New Jersey | 23.8% | 77 (23.8% of 323) | 9.8 standard deviations |

Dr. Wright opines that if a disparity is six standard deviations, the probability of a chance occurrence is "almost zero," and that if a disparity is 9.8 standard deviations, the probability of a chance occurrence is "indistinguishable from zero."  (Report of Richard Wright, Dec. 29, 2008, ¶ 3.)

Dr. Wright also compared the proportion of African Americans employed by the NHRFR with the proportion of African Americans in the population in general (1) of the Member Municipalities; (2) within a five mile radius of the centroid of North Hudson; and (3) within a ten mile radius of the centroid of North Hudson.

|  | Proportion of AAs in the Population | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
|---|---|---|---|
| Member Municipalities | 3.4% | 11 (3.4% of 323) | 2.76 standard deviations |
| 5 Mile Radius | 5.8% | 19 (5.8% of 323) | over 4 standard deviations |
| 10 Mile Radius | 15.8% | 51 (15.8% of 323) | 7.47 standard deviations |

Dr. Wright opines that if a disparity is 2.76 standard deviations, the probability of this difference resulting from a chance occurrence is about 3 in 1000; if a disparity is over four standard deviations, the probability of this difference resulting from a chance occurrence is

"indistinguishable from zero;" and if a disparity is 7.47 standard deviations, the probability of this difference resulting from a chance occurrence is "indistinguishable from zero."  (Report of Richard Wright, Dec. 29, 2008, ¶ 4.)

Additionally, Dr. Wright examined commuting times in order to define the expected labor market for the NHRFR.  The United States Census Bureau reports that the average daily commute to work in 2003 in the United States was 24 minutes and in Hudson County was 29 minutes.  (Report of Richard Wright, June 27, 2008, ¶ 8.)  Dr. Wright performed a Geographic Information System (GIS) analysis of the population, by broad racial/ethnic group within five mile and ten mile bands from the centroid of North Hudson.  He opined that much of the area within the ten mile band was within the 29 minutes average commuting time for Hudson County.  (Id.)  Relatedly, Dr. Wright opines that the appropriate labor market from which NHRFR may be expected to draw its protective service personnel is either the whole state or the neighboring three-county area.  Dr. Wright asserts that persons whose occupations are constrained by states' requirements, such as the requirement of a license to practice psychiatry, tend to search for jobs statewide.  Because "[f]irefighters in New Jersey must have passed various firefighter exams, which are statewide tests," he opines that "[i]t follows that their job search field may be considered statewide."  (Id. ¶ 10.)

Dr. Wright then compares the proportion of African Americans employed by the NHRFR with the proportion of African Americans in New Jersey's workforce or in the Tri-county area engaged in full time protective service work.

|  | Proportion of AAs Employed in Full Time Protective Service Work | Number of AAs Expected to be Employed by NHRFR | Difference Between Expected and Actual Number (2) Employed |
| --- | --- | --- | --- |
| Tri-county | 37.4% | 121 (37.4%  of 323) | 13 standard deviations |

| New Jersey | 20% | 65 (20% of 323) | 8.76 standard deviations |
|------------|-----|-----------------|--------------------------|

Dr. Wright opines that disparities of 13 and 8.76 standard deviations have "virtually no probability" of occurring by chance.  (Report of Richard Wright, Dec. 29, 2008, ¶ 5.)

Based on his calculations, Dr. Wright concludes that African Americans "are significantly under-represented" in the NHRFR's work force and he "infer[s] that this likely results from discriminatory hiring practices."  (Report of Richard Wright, June 27, 2008, ¶ 15.) He also concludes that the data he examined "clearly shows that African Americans can and do work in substantial numbers and proportions for municipal governments within [NHRFR's] labor market area."  (Id. ¶ 16.)

**b.**    **Dr. Siskin's analysis**

In response to the Plaintiffs' expert report, NHRFR presents the expert report of Dr. Bernard Siskin, a Director of LECG, LLC, an expert services and consulting firm.  Dr. Siskin specializes in the application of statistics to the analysis of employment practices.  In his report, Dr. Siskin takes several different approaches to analyze the effect of the NHRFR's residency requirement on its employment of African Americans.  For all of his analyses, Dr. Siskin examines the following geographic regions: (1) the Member Municipalities; (2) the area within five miles of the NHRFR service area; (3) the area within ten miles of the NHRFR service area; (4) Hudson County; and (5) the area within the Tri-county area (Hudson, Essex, and Union).

First, Dr. Siskin examines the issue with the assumption that the relationship between the racial/ethnic mix of the population of those interested in and qualified to work for NHRFR is the same in the expanded areas as within the Member Municipalities.  Dr. Siskin contends that this assumption will generally overestimate the increase in the number of African Americans hired or

in the pool of applicants because as the area expands out from the Member Municipalities, "the more African American the area is and, logically, one would expect that the further the commute, the lower the likelihood that one would chose [sic] to join the NHRFR, especially if equal opportunities existed closer to the individual's residence." (Report of Bernard Siskin, Nov. 18, 2008, ¶ 8.) African Americans make up 0.62 percent of the employees in the NHRFR, and make up 3.6 percent of the population of the Member Municipalities. Dr. Siskin uses this ratio (0.62/3.6 = 17.22%) as a "link or benchmark between the racial/ethnic mix of the population and the racial/ethnic mix among those interested and qualified for the position." (Id. ¶ 9.) Assuming the same relationship exists in the other areas, Dr. Siskin estimates the number of African Americans expected in the NHRFR workforce if it were expanded to include the following areas:

| Geographical Area | Expected Number of African Americans in NHRFR Workforce |
|---|---|
| Member Municipalities | 2 (actual number) |
| Hudson County | 8 |
| Tri-county | 15 |
| New Jersey | 8 |
| 5 Mile Radius | 3 |
| 10 Mile Radius | 9 |

(Id. at Table 4.) Dr. Siskin asserts that under this calculation, removing the residency requirement would be expected to result in a small increase in the percent of African Americans in NHRFR's workforce and a substantial decrease in the number of Hispanics in the NHRFR's workforce with the primary benefit of the change accruing to non-Hispanic whites. (Id. ¶ 10.)

Next, Dr. Siskin calculates the expected number of African Americans in the NHRFR workforce based on actual applicants and their scores on the 1999, 2002, and 2006 exams (from data obtained from the DOP) if the residency requirement were changed to the different geographical areas listed in the table above.  Dr. Siskin created new DOP lists (excluding applicants of unknown racial background) using veteran's status and final average test scores to rank the applicants as they would have been ranked if the residency requirement were changed to Hudson County, the Tri-county area, a five mile radius or a ten mile radius.  He calculated the racial breakdown of the applicants in the top 35, top 50, top 65 and top 90 of those lists and also the change vis-a-vis the racial composition of the actual DOP (challenged) lists.  For each of these three years, expansion of the geographic area to within five miles or to all of Hudson County results in the addition of only one to three African Americans and the addition of several whites at the expense of Hispanic applicants (varying from year to year and among the top 35, top 50, top 65 and top 90 lists).  Once the geographic area is expanded to within 10 miles or to the Tri-county area, however, for the years 1999 and 2006, there is a significant increase in the number of African Americans.  (See id. at Table 6-1999 and 6-2006.)  For example, on the 1999 list, the number of African Americans added when the list is expanded to the Tri-county area is: 12 added in the top 35; 15 added in the top 65; and 18 added in the top 90.  (Id. at Table 6-1999.) These additions are at the expense of both whites and Hispanics, but more heavily at the expense of Hispanics.  On the 2002 list, the expansion of the geographic regions has a much smaller impact on the number of African Americans.  (See id. at Table 6-2002.)  For example, when the 2002 list is expanded to within 10 miles, only three African Americans are added, even when the list extends into the top 90; additionally, the number of Hispanics decreases while the number of whites increases.  (Id.)  When the 2002 list is expanded to the Tri-county area, ten African

17

Americans are added.  Based on these calculations, Dr. Siskin concludes that doing away with the residency requirement would adversely impact Hispanic candidates, generally would cause white representation to increase and, "with the exception of the larger expanded (i.e., Tri-county area, there is a trivial increase in African Americans."  (Id. ¶ 13.)

Dr. Siskin's last analysis uses the same revised DOP lists based on the expanded geographical regions for the residency requirement but incorporates the assumptions that if a non-resident applicant received an appointment elsewhere, he would accept that appointment and not be in competition for a position at NHRFR.  Dr. Siskin bases this assumption on data that indicates that, among the appointments from the DOP lists in New Jersey, an applicant was very likely to be appointed within the jurisdiction in which he/she resided.  Excluding NHRFR appointments, of the 1,820 appointments made since 1999, 60 percent were in the jurisdiction in which the applicant resided; the value increases to 78 percent[7] among veterans.  Among African Americans, the home town appointment rate was 73 percent overall and 81 percent among veterans.  (Id. ¶ 15.)  Dr. Siskin recalculated the racial make-up of the top 35, top 50, top 65 and top 90 on the lists for 1999 and 2002 using this new assumption.  This new assumption did not affect the lists for 1999 at all (see id. Table 6-1999 and Table 8-1999) and resulted in the addition of a few more African Americans to the Tri-county list for 2002.  (See id. Table 6-2002 and Table 8-2002.)  For the 2006 lists, Dr. Siskin not only excluded non-resident applicants who had received an appointment elsewhere, but he also excluded applicants whose rank on some other list was substantially better than his rank on the new NHRFR list.  Dr. Siskin defined "substantially better" as having a rank order number (where a lower number means a better rank) on the expanded NHRFR list at least twice the best rank order number on another list.  This new

---

[7]Dr. Siskin's report gives this value as "[s]even-eight" percent, but the court assumes the intended value is seventy-eight (78) percent.

assumption drastically changed the 2006 lists.  With the exclusion of those having a significantly

better rank on another list, either zero or only one African American is added to the 2006 lists.

There are few changes in any geographic area for the top 35 and top 50 lists; in the top 65 and

top 90 lists whites gain between two and eleven spots while Hispanics lose between three and 17

spots.  Based on these additional calculations, Dr. Siskin again concludes that "doing away with

the residency requirement/preference would adversely impact Hispanic candidates, generally

increase white representation and generally have a trivial impact on African Americans."  (Id.

¶ 16.)

### c.    Comparison of Experts' Reports

As the Court of Appeals has explained, in determining whether a plaintiff has presented a

prima facie case of disparate impact through presentation of statistics, the plaintiff must prove

not only statistical disparities in the employer's workforce, but also that the challenged practice

causes that disparity.  In the statistical analysis, "[t]he 'proper comparison [is] between the racial

composition of [the at-issue jobs] and the racial composition of the qualified . . . population in

the relevant labor market.'" Bayonne, 134 F.3d at 121 (quoting Wards Cove, 490 U.S. at 650).

Here, the racial composition of the at-issue jobs is known:  it is undisputed that two out of the

323 employees of the NHRFR are African American.  Each party's expert, however, provides a

different view of both the qualified population and the relevant labor market.

Only the Plaintiffs present an analysis of what area should comprise the relevant labor

market.  As discussed above, based on his analysis of commuting times and other considerations

in a job search, Dr. Wright concluded that "the appropriate labor market from which North

Hudson [NHRFR] may be expected to draw its prospective service personnel is either the whole

state or the neighboring three county area."  Because Dr. Wright's conclusion regarding the

19

relevant labor market is based in sound reasoning, and because NHRFR did not dispute this particular conclusion of Dr. Wright, the court will consider the relevant labor market to be either the Tri-county area or the entire state of New Jersey. The Plaintiffs seek the expansion of the residency requirement to the Tri-county area.

Dr. Siskin and Dr. Wright present different views on how to define the "qualified population" to be considered in this analysis. Given the relevant labor market as either the Tri-county area or the entire state of New Jersey, however, both experts' reports support a finding of discrimination based on a disparate impact from the residency requirement. Dr. Wright calculates the number of African Americans one would expect to be employed by the NHRFR based on several metrics, including the proportion of African Americans employed in state and local government and the proportion of African Americans in the population in general. These metrics, however, do not fully account for the requirement that the population be qualified. Certainly the population in general cannot be assumed to be qualified for a job with the NHRFR, and it is unclear whether the qualifications for employment in state and local government in New Jersey would be similar to those required for a ranking on the DOP list. The last comparison made by Dr. Wright more closely tracks the requirement of a qualified population because it uses the percentage of African Americans engaged in full time protective service work in the relevant labor markets to predict the percentage of African Americans one would expect to be employed by the NHRFR. The qualifications for employment in full time protective service work in the Tri-county area or in New Jersey would be similar to the qualifications to be employed by the NHRFR. Dr. Wright calculated that because 37.4 percent of those employed full time in protective service work in the Tri-county area are African American, one would expect 37.4 percent, or 121, of the employees of the NHRFR to be African American. In the alternative,

because 20 percent of those employed full time in protective service work in New Jersey are African American, one would expect 20 percent, or 65, of the employees of the NHRFR to be African American. The difference between these expected numbers of African Americans – 121 or 65 – and the actual number employed by the NHRFR – 2 – is striking and is sufficiently substantial to raise an inference of causation.

Dr. Siskin asserts that Dr. Wright's analyses are "critically flawed because he never attempts to control for differences in the likelihood of being qualified for the position, as determined by the results of the N.J. D.O.P. process for firefighter eligibility." (Report of Dr. Siskin, Nov. 18, 2008, ¶ 20.) While this is a valid criticism of Dr. Wright's comparisons using only general population data or data on the percentage of African Americans employed in state and local governments, Dr. Wright's last analysis accounted for the likelihood of being qualified for the position because it was based on a percentage of African Americans in full time protective services in the relevant labor markets.

Further, Dr. Siskin's own analyses using the DOP test results, when considered in the relevant labor market, further supports an inference of causation. Using the actual DOP test results obviously accounts for the requirement that the population being compared is "qualified." While his analyses did not show any significant increase in the number of African Americans who would be on the DOP lists if the residency requirement were expanded to within five miles of the NHRFR service area or to all of Hudson County, once the geographic area was expanded to include the relevant labor market of the entire Tri-county area, a significant number of African Americans were added to the DOP lists.

Dr. Siskin also asserts that a change in the residency requirement of the NHRFR would benefit whites at the expense of the employment prospects of Hispanics, with a minimal benefit

to African Americans.  The Court will examine his findings more closely to bring this argument into focus.  The number of African Americans added when the list is expanded from the NHRFR local area to the Tri-county area is:

- On the 1999 list, 12 added in the top 35 (at the expense of 4 whites and 8 Hispanics), 15 added in the top 50 (at the expense of 7 whites and 8 Hispanics), 17 added in the top 65 (at the expense of 7 whites and 10 Hispanics), and 18 added in the top 90 (at the expense of 3 whites and 15 Hispanics)[8]

- On the 2002 list, 8 added in the top 35 (at the expense of 8 Hispanics and the addition of 3 whites), 5 added in the top 50 (at the expense of 6 Hispanics and the addition of 1 white), 8 added in the top 65 (at the expense of 9 Hispanics and the addition of 1 white), and 10 added in the top 90 (at the expense of 18 Hispanics and with the addition of 8 more whites)[9]

- On the 2006 list, 12 added in the top 35 (at the expense of 10 Hispanics and with the addition of 2 whites), 11 added in the top 50 (at the expense of 7 whites and 5 Hispanics), 12 added in the top 65 (at the expense of 8 whites and 5 Hispanics), and 18 added in the top 90 (at the expense of 10 whites and 10 Hispanics)[10]

Dr. Siskin then incorporated the assumption that if a non-resident applicant received an appointment elsewhere, he would accept that appointment and not be in competition for a position at NHRFR.  The resulting number of African Americans added when the list is expanded from the NHRFR local area to the Tri-ounty area is:

- On the 1999 list, the results were the same as the results in Table 6-1999, detailed above[11]

- On the 2002 list, 10 added in the top 35 (at the expense of 6 Hispanics and with the addition of 1 white), 7 added in the top 50 (at the expense of 1 white and 6 Hispanics), 10 added in the top 65 (at the expense of 11 Hispanics and with the addition of 1 white), and 10 added in the top 90 (at the expense of 17 Hispanics and with the addition of 7 whites)[12]

---

[8] See Table 6-1999.
[9] See Table 6-2002.
[10] See Table 6-2006.
[11] See Table 8-1999.
[12] See Table 8-2002.

The only tables that do not predict any added African Americans are Tables 7-2006 and 8-2006,[13] which exclude applicants who have a "better rank" outside of the NHRFR area.[14] However, when the Court compares the results of Table 8-2006 to Tables 8-1999 and 8-2002, the it appears that the assumption underlying Table 8-2006 may not bear out in reality.  Since Tables 8-1999 and 8-2002 are based on the actual number of applicants who were hired by another department, the results in those tables are grounded in actual past events.  On the other hand, Table 8-2006 deleted candidates based on Dr. Siskin's definition of "substantially better" ranking on another list.  The drastic difference between the Tables 8-1999 and 8-2002 and the Table 8-2006 shows that Dr. Siskin's assumption that those with a better rank would be hired by another department might not play out so starkly in reality.  On the 8-1999 and 8-2002 Tables, 12 and 8 African Americans were added to the top 35.  On 8-2006, zero African Americans were added to even the top 90.  The difference between Tables 6-1999 and 8-1999, or Tables 6-2002 and 8-2002, shows that controlling for actual outside hiring does not drastically change the results.  In fact, the results for 6-1999 and 8-1999 were unaffected when Dr. Siskin controlled for outside hiring.  In contrast, the difference between 6-2006 (18 African Americans added to the top 90) and 8-2006 (zero African Americans added to the top 90) is significant.  This leads the Court to conclude that Dr. Siskin's assumption in 8-2006 far over-emphasizes the impact of hiring in other jurisdictions on the number of African American applicants who would be highly ranked on the Tri-county lists.  Moreover, a comparison of Tables 6-2002 and 8-2002 shows that

---

[13] Both Table 7-2006 and Table 8-2006 are based on the same assumption and differ only in that they represent the population changes from a slightly different perspective.

[14] Specifically, as the Court previously detailed, Dr. Siskin calculated the expected number of African Americans on the lists in 2006, excluding candidates who had received an appointment elsewhere, but also excluding applicants whose rank on some other list was substantially better than his rank on the new NHRFR list.  Dr. Siskin defined "substantially better" as having a rank order number (where a lower number means a better rank) on the expanded NHRFR list at least twice the best rank order number on another list.

controlling for applicants who were appointed elsewhere in some instances resulted in more blacks, more Hispanics, and less whites.[15]  Since the Tables 8-1999 and 8-2002 are based on more concrete figures than the figures based on a potentially flawed assumption in Table 8-2006, the Court finds that their results are more compelling.

Based on the data above, Dr. Siskin's own results predict that a significant number of qualified African Americans would be eligible and qualified for employment with the NHRFR if the labor market were expanded to the Tri-county area; Dr. Siskin concluded that "with the exception of the larger expanded (i.e., Tri-county) area, there is a trivial increase in African Americans."

The NHRFR disputes that the assumption underlying the Table 8-2006 is problematic, contending that DOP civil service reflects that an appointee was "very likely to be appointed within the jurisdiction in which he/she resided."  That statement, however, does not address the precise conflict that is inherent in Dr. Siskin's conclusions.  In Table 8-2006, Dr. Siskin applies an assumption that purports to control for the possibility that candidates from neighboring areas will self-select to compete for work in their own jurisdiction rather than in a nearby jurisdiction. However, Dr. Wright concluded—and the Defendants have not disputed—that the commute for a firefighter would be reasonable from any part of the Tri-county area and that firefighters are likely to seek work statewide.  Dr. Siskin's data which shows that firefighters are more likely to work in their home jurisdictions does not raise an inference that firefighter candidates from the Tri-county area would not want to work in North Hudson—rather, Dr. Siskin's point was that statewide, a firefighters was "very likely to be appointed within the jurisdiction in which he/she resided."  The fact that on a statewide level, firefighters are statistically likely to be appointed in their home jurisdiction has no bearing on the question of whether an applicant who lives in, for

---

[15] Compare the top 35 and top 90 candidates on Tables 6-2002 and 8-2002, respectively.

instance, southern Hudson County, would want a job if offered one in the NHRFR.  Furthermore, as the Court previously discussed, the stark contrast between Dr. Siskin's Table 8-2006 (based on the assumption about significantly higher ranking on another list) and Tables 8-2002/8-1999 (based on actual past hiring data) makes the assumption underlying the 8-2006 data suspect. Since the Plaintiffs have established that both experts' reports support a statistical finding of disparate impact, the burden on a summary judgment motion shifts to the non-moving party to show that there is a genuine issue of fact requiring trial.  Defendants have failed to raise a genuine dispute that the 2006 data predicts that no African Americans would be in the top-ranked candidates on a DOP list.

The NHRFR argues that <u>Bayonne</u>, 134 F.3d at 117, dictates that the Court must rely on Table 8-2006 since it "used actual data."  (Def.'s Reply Br. 6.)  In <u>Bayonne</u>, the NAACP filed a Title VII suit challenging Bayonne's residency requirement for hiring police and firefighters, asserting that the requirement unlawfully discriminated against African Americans.  The parties agreed on settlement terms, including that Bayonne would suspend the residency requirement and affirmatively recruit African American applicants.  <u>Id.</u> at 115.  Four years later, when the removal of the residency requirement "failed to increase—and in the case of police officers decreased—the representation of African Americans among its workforce, Bayonne reinstated the residency requirement."  <u>Id.</u>  The NAACP sued for injunctive relief, and the district court found that the NAACP "had failed to establish a causal nexus between the residency requirement and its allegedly disparate impact on African Americans."  <u>Id.</u>  The Court of Appeals upheld the district court's determination, and distinguished <u>Harrison</u>, 940 F.2d 792, from <u>Bayonne</u> on the grounds that:

> [T]he only evidence presented in <u>Harrison</u> were projections based on statistics;
> here there is direct evidence consisting of hiring percentages of African American

applicants during the four years in which Bayonne removed its residency requirement.  Statistics 'are not irrefutable; they come in infinite variety and, like any other evidence, they may be rebutted.  In short, their usefulness depends on all of the surrounding facts and circumstances.'  In Title VII cases, we often rely on statistical evidence because direct evidence of the effect of a particular employment practice is not available….In this case, no projection is necessary because there is direct evidence of the impact of the challenged practice….Faced with the record, we believe that the district court did not commit clear error in finding that the NAACP had failed to prove causation.

Id. at 123 (quoting Int'l Bhd. Of Teamsters v. United States, 431 U.S. 324, 340 (1977)).

The information before the Court is very different from the information that the Court of Appeals had in Bayonne.  In Bayonne, the Court of Appeals was presented with actual hiring data from four years without the residency requirement.  Here, the analysis that the NHRFR presents as "actual data" is actually based on an assumption by Dr. Siskin that is unsupported by the evidence and by Dr. Siskin's own findings.  The teaching of Bayonne is simply inapposite here, since the Court does not have years of real hiring data without the residency requirement. The list certified by the DOP after the Court issued the injunction on February 18, 2009, might have provided some additional guidance but it does not contain information about the race, ethnicity or national origin of the candidates, so the Court is unable to decipher from it any information about the impact that removing the residency requirement might have on minority hiring.

Defendants also argue that historically, removing residency requirements has not increased hiring of African Americans.  First, they assert that the Bayonne case supports their argument.  Second, they assert that the "NAACP president[, James Harris,] has admitted" that the NAACP "hasn't had a whole lot of good news to report, quite frankly…[m]ost of the municipalities that were under the court decree have not been that successful."  (James Harris Dep. 41:18-42:5, May 13, 2008.)   This quote, however, is taken out of context, and the results of

26

the Bayonne case are irrelevant to the present matter because there has been no showing that the results in Bayonne will predict the future result of expanding the residency requirement in the NHRFR.   The context of Harris's statement precludes the Court from finding any support for the NHRFR's assertion that changing residency requirement has had no effect on the employment prospects of minorities competing for public sector employment in New Jersey.  Harris stated that many court decrees were unsuccessful because "[t]here's a pervasive pattern of racism in this state….some of these folks don't want to—they don't find a way" to make progress. Additionally, Harris stated, "[w]e've seen some of the municipalities that have put forth an effort….[w]e've seen others that seem to have forgotten that they were supposed to do that." (Id.)

The NHRFR argues, solely on the basis of Table 8-2006, that "if the residency requirement is removed, Regional will be forced to hire significantly less Hispanics and more Caucasians, with no material increase in African-American representation."  (Def.'s Opening Br. 10.)  Based on the aforementioned flaw in the assumption underlying Table 8-2006 and the contrary results in Tables 8-1999 and 8-2002, the Court cannot accept the NHRFR's conclusory argument that expanding the list to the Tri-county area would not result in any material increase in qualified African American candidates.  On Tables 8-1999 and 8-2002 (which controlled for actual outside hiring), 12 and 8 African Americans, respectively, were added to the top 35 ranked candidates when the list was expanded to the Tri-county area.  That increase is significant.

The NHRFR also asserts, again on the sole basis of 8-2006, that "Plaintiffs have failed to identify even a single African-American who would have been hired by the Regional if there was no residency requirement."  (Def.'s Opening Br. 15.)  That contention is contradicted by the NHRFR's own expert's analysis.  Expanding the residency requirement to the Tri-county area in

Tables 6-1999, 6-2002, 6-2006, 8-1999, and 8-2002 added between 8 and 12 African Americans to the top 35 candidates on the lists.  Additionally, the Plaintiffs have presented evidence that 850 African American candidates who lived in the Tri-county area passed the examinations in 2006 and would have been eligible to compete for positions with the NHRFR if it were not for the residency requirement.  (Rose Cert. App. F, G.)  The Court concludes that a significant number of African Americans would have been added to the top ranked candidates on the 1999, 2002 and 2006 lists, had the NHRFR expanded its residency requirement to include the Tri-county area.  This finding supports an inference of causation which the Defendants have been unable to dispute; the disparity between the qualified population of African Americans in the relevant labor market (as measured by Dr. Siskin's predictions of top-ranked individuals) and the number of African Americans actually employed by the NHRFR is sufficiently substantial to support an inference of causation.

ii.     *Business Necessity Affirmative Defense*

The Court erred in its April 2010 Opinion by citing the business necessity standard announced in Wards Cove.  See NAACP v. North Hudson Regional Fire & Rescue, 109 Fair Empl. Prac. Cas. (BNA) 262 (D.N.J. 2010) (stating that the NHRFR need only "demonstrate that the practice furthers legitimate business goals 'in a significant way.'") (citing Harrison, 940 F.2d at 803 (quoting Wards Cove, 490 U.S. at 659)).  The Wards Cove standard that the Court cited was expressly overruled by the Civil Rights Act of 1991, which requires an employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k); Ricci, 129 S. Ct. at 2673.

The Court also erred by stating that the "burden of production with regard to the business necessity defense is on the employer, while the burden of persuasion rests at all times with the

plaintiffs." <u>North Hudson</u>, 109 Fair Empl. Prac. Cas. (BNA) 262 (citing <u>Harrison</u>, 940 F.2d at 798). The Civil Rights Act of 1991 clearly established that "both the burden of production and the burden of persuasion in establishing business necessity rest with the employer." <u>Lanning v. Se. Pa. Transp. Auth.</u>, 181 F.3d 478, 487 (3d Cir. 1999) (citing 42 U.S.C. § 2000e-2(k)); <u>Lewis v. City of Chicago</u>, 130 S. Ct. 2191, 2198 (2010).

To show that a requirement is job-related, the defendant must show that it was "not an artificial, arbitrary, or unnecessary barrier, because it measured skills related to effective performance of [the job]." <u>Teal</u>, 457 U.S. at 451. The Court of Appeals requires an employer whose practice has been shown to have a disparate impact to prove that the requirement in question "measure[s] the minimum qualifications necessary for successful performance of the job in question." <u>Lanning</u>, 308 F.3d at 286. The business necessity defense dictates that "[i]f an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." <u>Ricci</u>, 129 S. Ct. at 2673 (quoting <u>Griggs</u>, 401 U.S. at 431) (alteration in original)).

Plaintiffs argue that the Defendants have not carried either their burden of production or persuasion. They assert that the only evidence of a business reason for the residency requirement the NHRFR produced was the limited testimony of Jeffrey C. Welz, the Co-Director of the NHRFR. Moreover, Plaintiffs argue that the Defendants have failed to carry their burden of persuasion because the justifications asserted in the NHRFR's and Intervenors' briefs are not job related for the firefighter positions at issue in this case.

The NHRFR assert that the residency requirement is justified by business necessity because it (1) increases the likelihood that firefighters in the NHRFR will live in the area, which means they will be more familiar with the buildings and the streets, and also that they will be

able to respond more quickly in the case of an emergency; (2) avoids liability to Intervenors and comports with the goals of the <u>Rodriguez</u> settlement agreement; (3) increases the number of Spanish-speaking NHRFR employees, which is helpful since the communities the NHRFR serves are 69.6 percent Hispanic; and (4) fosters pride in the community.  The Court will address each of the NHRFR's asserted justifications in turn.

First, the NHRFR argues that the residency requirement promotes familiarity with the geography of the area and swift emergency response-time.  During his deposition, Welz stated that being a resident would help firefighters learn the geography of the five municipalities. Specifically, he stated, "[b]eing a resident…you are familiar with the immediate area."  (Welz Dep. 12:7-10, June 9, 2008.)  However, he also conceded that many firefighters learn the geography of the area after they have the job.  (<u>Id.</u> 12:20-21.)  The NHRFR has not met its burden of showing that living in North Hudson before becoming a firefighter is a minimum requirement necessary for the successful performance of the job; candidates can easily study the area and learn its geography.

Next, the NHRFR argues that the residency requirement promotes swift emergency response time because it increases the probability that its firefighters will live nearby.  However, the NHRFR has not produced any evidence demonstrating how often—if ever—off-duty firefighters are required to respond to an emergency.  It is the employer's burden to establish that a given requirement is necessary to the performance of an employee's duties.

In support of its argument, the NHRFR asserts, citing to <u>Lanning</u>, 181 F.3d at 490, that "emergency preparedness or public safety is a sound business justification for firefighter residency requirements."  (Def.'s Br. Opp'n Mot. Summ. J. 10.)  However, the NHRFR's reliance on <u>Lanning</u> for that proposition is misplaced.  First, <u>Lanning</u> dealt only with public

safety, not with emergency preparedness.  Second, <u>Lanning</u> required that the business

justification of public safety be tied to candidates' minimum qualifications necessary for

successful performance of the particular job.  In <u>Lanning</u>, the Court of Appeals examined the

business necessity standard in relation to an employer's cutoff score on an examination that

screened mass transit security officer candidates' level of physical fitness.  The Court of Appeals

determined that the fitness data the employer had submitted only showed that the high cutoff

score might make a person a better officer; but it did not establish that the cutoff tested for the

minimum fitness requirement for successful job performance that would be necessary to justify a

disparate impact on female candidates.  <u>Lanning</u>, 181 F.3d at 492-93.

In the same way, the NHRFR's assertion that the residency requirement makes it more

likely that firefighters will live close to work is more of a preference than a mandatory minimum

requirement.  This is especially true in light of the data the NHRFR presented about where the

279 firefighters it employed as of September 3, 2008 lived.  (Kobin Supp. Cert. App. A.)  The

list reflects that 22 firefighters lived in West New York, 22 in Weehawken, 5 in Guttenberg, 13

in Union City, and 33 in North Bergen; all together, 95 of the 279, or approximately 34 percent

of the firefighters on that list lived in one of the five Member Municipalities.[16]  (<u>Id.</u>)  The

remaining firefighters on the list appear to live throughout the state, including a number who live

in Ocean County.  The residency requirement is based only upon an applicant's residence at the

time he or she takes the exam so NHRFR employees are free to live where ever they choose.

The Defendants have not proved that residency in one of the Member Municipalities at the time

of hiring is a minimum requirement for successful performance as an NHRFR firefighter.

---

[16] The NHRFR's brief claims that the list it provided reflects that 122, or 36 percent of the
NHRFR's employees lived in the Member Municipalities in 2008.  However, the NHRFR did
not provide the Court with a basis for its calculations, so the Court calculated the residencies of
the firefighters listed based on the 6-page document the NHRFRF provided and found above-
described results.

The next justification offered by the NHRFR is the <u>Rodriguez</u> settlement and avoiding a suit by Hispanics.  In <u>Rodriguez, et al. v. North Hudson Regional Fire and Rescue</u>, Civ. No. 01-3153 (filed in this Court), thirteen Hispanic firefighters of Central, South American and Caribbean origin who alleged that they were qualified to compete for lieutenant officer positions, asserted a Title VII claim alleging that the NHRFR's promotion practices disparately impacted firefighters of Hispanic origin.  Paragraph four of the second amended complaint in that case alleged that of approximately 274 firefighters employed by the NHRFR at the time, only 22, or 7 percent, were Hispanic.  Of the approximately 100 lieutenants and other officers in the NHRFR's employ, there were no officers of Hispanic-Latino descent.  The parties eventually settled the matter and accordingly, the Court entered an order dismissing the suit.  The settlement agreement provided for the promotion of four of the plaintiffs to officer positions and for the NHRFR to place advertisements in local Spanish language media giving notice of upcoming examinations, so as to reach and attract qualified applicants of Hispanic origin.  When the NHRFR hired new firefighters between July 1, 2007 and October 2007 (the last time the NHRFR hired), 38 percent of the new hires were Hispanic.  (<u>Id.</u>)

Although avoiding future litigation may be a business concern, the NHRFR has not argued—and in fact, it could not—that avoiding litigation is somehow related to the job performance of firefighters.  Furthermore, the Plaintiffs correctly assert that <u>Rodriguez</u> did not involve the residency requirement.  The residency requirement is not addressed in the <u>Rodriguez</u> settlement, so the NHRFR cannot contend that it would be directly violating the agreement's terms if it were to do away with the residency requirement.  Moreover, the NHRFR has offered no evidence that the purpose of adopting the residency requirement was to increase Hispanic applicants for employment.  Rather, Welz stated during his deposition that it was his

understanding that the NHRFR instituted a residency requirement when it was formed in 1998 because the Member Municipalities had residency requirements before they were consolidated. (Welz Dep. 10:22-11:3.)  The NHRFR has proved that expanding the residency requirement would violate the Rodriguez agreement.  More importantly, there is no evidence that the NHRFR's goal of avoiding future litigation is related in any way to the ability of firefighters to perform their job duties.   Similarly, the justification of "community spirit" does not provide the NHRFR with a job-related business necessity that could justify the residency requirement, especially in light of the fact that the residency requirement allows firefighters to move out of the community after they are hired.

Finally, the NHRFR argues that the residency requirement increases the number of Hispanic firefighters who may speak Spanish, which in turn promotes communication with the community the NHRFR serves.  However, the NHRFR has not presented the Court with any information about its language requirements beyond citing the statistic that the population of the Member Municipalities is 69.6 percent Hispanic.  The fact that a person is of Hispanic descent does not necessarily mean that he or she speaks Spanish.  Therefore, the fact that a large segment of the population is Hispanic does not shed any light on the question of how many residents of the Member Municipalities do not speak English.  NHRFR has not provided the Court with any evidence of how many of their Hispanic firefighters speak Spanish, nor have they attempted to inform the Court of the percentage of people in their community that might require translators.

The Plaintiffs do not dispute that having some Spanish-speaking firefighters could be related to job function.  However, they argue that even if NHRFR could meet its burden of proving that the residency requirement serves some necessary business purpose or job-related function, there are less discriminatory alternative ways the NHRFR could achieve the goal of

communication with the Spanish-speaking members of the community it serves.  Successful
assertion of the business necessity defense can be overcome by the plaintiffs "by showing that an
alternative policy [or selection device] exists that would serve the employer's legitimate goals as
well as the challenged policy with less of a discriminatory effect."  El v. Se. Pa. Transp. Auth.,
479 F.3d 232, 239 n.9 (3d Cir. 2007).  Here, the Plaintiffs suggest that the NHRFR could require
some percentage of its firefighter candidates be bilingual.  The Court finds that even if the
NHRFR proved that the residency requirement was job-related in that it ensured that some
Spanish-speaking residents would be hired, the goal of communicating with Spanish-speakers in
the community could be achieved by the alternative policy the Plaintiffs suggest.  In fact, the
NHRFR provided the Court with a DOP application for "Firefighter and Firefighter Bilingual in
Spanish and English," which allows applicants to check a box if they are bilingual.  (Kobin Cert.
App. 10.)  The policy the Plaintiffs suggest would have a less discriminatory effect because it
would be more narrowly tailored to the job-related function of having some firefighters with
Spanish-language skills, rather than the broader requirement of residence in the Member
Municipalities at the time a candidate is hired.

        The goal of the disparate impact statute is to eradicate discrimination that occurs
"through the application of practices fair in form but discriminatory in practice by eliminating
unnecessary barriers to employment opportunities."  Lanning, 181 F.3d at 489 (emphasis in
original).  The Supreme Court recently reaffirmed that under the Civil Rights Act of 1991,
"[u]nless and until defendant pleads and proves a business necessity, the plaintiff wins by simply
showing the stated elements."  Lewis v. City of Chicago, 130 S. Ct. 2191, 2198 (2010).  As the
Court has not found any evidence supporting the NHRFR's assertion that the residency

requirement is necessary to the successful performance of the firefighter job functions, the Court must reject the NHRFR's asserted business necessity defense.

    iii.    *Ricci's Impact on the Court's Decision*

The Intervenors contend that the NHRFR has a "Ricci defense" to the Plaintiffs' suit.  In Ricci, the City of New Haven used objective examinations, along with certain other qualifications, to identify firefighters best qualified for promotion.  The City's contract with the firefighter's union provided for a written examination accounting for 60 percent and an oral examination accounting for 40 percent of an applicant's total score.  The City hired Industrial/Organizational Solutions, Inc. ("IOS") to develop and administer the examinations. IOS conducted exhaustive studies to develop appropriate written and oral examinations, including special steps to ensure that the examinations would not unintentionally favor white candidates.  IOS developed a list of training manuals for each test.  The City opened a three-month study period and gave the candidates a list that identified the source materials for the questions.  Numerous other measures were adopted to ensure the fairness of the tests and to assist candidates to prepare to take them.  Many firefighters studied for months at considerable personal and financial cost.

Candidates took the examination in November and December 2003.  Seventy-seven candidates completed the lieutenant examination - 43 whites, 19 blacks and 15 Hispanics.  Eight lieutenant positions were vacant at the time of the examination.  Under the rule of three,[17] this meant that the top 10 candidates were eligible for an immediate promotion to lieutenant.  All 10 were white.  Subsequent vacancies would have allowed at least 3 black candidates to be considered.

---

[17] Under the City's charter, the relevant hiring authority must fill each vacancy by choosing one candidate from the top three scores on the list.  Certified promotional lists remain valid for two years.

Forty-one candidates completed the captain examination - 25 whites, 8 blacks and 8 Hispanics. Of those, 22 candidates passed - 16 whites, 3 blacks and 3 Hispanics. Seven captain positions were vacant at the time of the examination. Under the rule of three, 9 candidates were eligible for immediate promotion to captain - 7 whites and 2 Hispanics.

These results engendered a bitter public debate.[18] Some firefighters and public groups argued that the tests should be discarded because the results showed the tests to be discriminatory. Other firefighters said the examinations were neutral and fair. Each faction threatened a discrimination lawsuit if its position was rejected. Hearings were held, IOS presented a detailed description of the process through which it went to develop the tests; and those demanding that the City reject the results produced witnesses and advocates of their position. Ultimately the City threw out the examinations.

Certain white and Hispanic firefighters who likely would have been promoted based on their test performances sued the City and certain of its officials, charging a violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Equal Protection Clause of the Fourteenth Amendment. The defendants defended their actions, arguing that if they had certified the results, they would have faced Title VII liability for adopting a practice that had a disparate impact on the minority firefighters. The District Court granted summary judgment for the defendants, and the Court of Appeals affirmed.

The Supreme Court reversed, stating:

We conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute. The respondents, we further determine, cannot meet that threshold standard. As a result, the City's action in discarding the tests was a violation of

---

[18] Justice Alito's concurring opinion, 129 S. Ct. at 2683-2690, describes the intensity of the debate and the racial and political currents that entered into the ultimate decision to throw out the examination results.

Title VII.  In light of our ruling under the statutes, we need not reach the question whether respondents' actions may have violated the Equal Protection Clause.

The Court began its analysis with the premise that "[t]he City's actions would violate the disparate treatment prohibition of Title VII absent some valid defense."  Id.  It then found that "[a]ll the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race . . . i.e., how minority candidates had performed when compared to white candidates."  Id.  The Court proceeded to determine whether the City had a lawful justification for its concededly race-based action.

The Court did not limit its holding to the examination situation.  It held as a general rule that:

> We hold only that, under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate impact liability if it fails to take the race-conscious, discriminatory action.

Id. at 2677.

Applying this rule the Court accepted the contention that the racial adverse impact of the test was significant and that the City was faced with a prima facie case of disparate impact liability.  Based on how the passing candidates ranked and an application of the rule of three, certifying the examination would have meant that the City could not have considered black candidates for any of the vacant lieutenant or captain positions.  The Court found that although these results compelled the City "to take a hard look at the examinations to determine whether certifying the results would have had an impermissible disparate impact. . . [t]he problem for respondents is that a prima facie case of disparate impact liability—essentially, a threshold showing of a significant statistical disparity, and nothing more—is far from a strong basis in

evidence that the City would have been liable under Title VII, had it certified the results." Id. at 2678 (citation omitted).

The City would have been subject to disparate impact liability "only if the examinations were not job related and consistent with business necessity, or if there existed an equally valid, less-discriminatory alternative that served the City's needs but that the City refused to adopt. § 2000e-2(k)(1)(A)(C)." Id. The Court reviewed the extensive evidence in the case and found that "[t]here is no genuine dispute that the examinations were job-related and consistent with business necessity. The City's assertions to the contrary are 'blatantly contradicted by the record.'" Id. As to a less discriminatory alternative, the Court found that the "[r]espondents also lacked a strong basis in evidence of an equally valid, less-discriminatory testing alternative that the City, by certifying the examination results, would necessarily have refused to adopt." Id. at 2679.

This Court examined Ricci in great detail in its April 2010 Opinion, stating that:

> [W]here the contention arises that a remedy for disparate impact will in practice constitute a race-based action causing disparate treatment to a different group, the strong basis in evidence standard announced in Ricci applies to the disparate impact claim. Here, the "race-based" remedy would be throwing out the NHRFR's residency requirement in order to "achieve a more desirable racial distribution" of candidates for hiring. See Ricci, 129 S. Ct. at 2677. That result would only be legitimate when there is a strong basis in evidence that discarding the residency requirement is "necessary to avoid violating the disparate-impact provision" of Title VII. See id. at 2676.

North Hudson, 109 Fair Empl. Prac. Cas. (BNA) 262.

Ricci was particularly relevant to the Court's April 2010 decision because in deciding whether to vacate or maintain the preliminary injunction, the Court was required to decide whether the Plaintiffs were likely to succeed on the merits of their disparate impact case. Thus,

like the City of New Haven in <u>Ricci</u>, the Court was tasked with making a prediction of the merits of a disparate impact claim. Moreover, as in <u>Ricci</u>, the Court was faced with the competing interests of a group whose members claimed they would be harmed if the relevant employment practice (in <u>Ricci</u>, the test results, in this case, the residency requirement) were changed. In the April 2010 decision, the Court was persuaded that before a determination on the merits, it was unfair to disadvantage the Hispanics by enjoining the NHRFR from hiring from its DOP list, because the residents of the NHRFR would be unable to obtain training and experience while the case was pending. However, now that the Court has determined that the Plaintiffs' disparate impact claim will succeed on the merits, that determination must override the Court's previous caution.

In <u>Ricci</u>, the Court rejected the petitioner's contention that an employer cannot take race-based adverse employment actions in order to avoid disparate impact liability even if the employer knows its practice violates the disparate-impact provision. In other words, under <u>Ricci</u>, a violation of the disparate-impact provision can justify an employment action that adversely affects another group.

Plaintiffs argue that <u>Ricci</u> stands for the proposition that New Haven could not throw out a test that was justified by business necessity simply because it wished to favor lower-scoring candidates on the basis of their ethnicity. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 11.) The Plaintiffs assert that by seeking to maintain the residency requirement in the face of a valid disparate impact claim, the Intervenors are advocating for the NHRFR to maintain a preference that causes a discriminatory impact and is not consistent with business necessity.

The Intervenors and the NHRFR maintain that the NHRFR would be liable to the Intervenors for disparate treatment if the NHRFR expanded the residency requirement to the Tri-

county area.  There is no basis for this argument.  In <u>Ricci</u>, the Court assumed that the City of New Haven would be liable for disparate treatment to the petitioners absent some valid defense because the City threw out the examination results on the sole basis "of the statistical disparity based on race—i.e. how minority candidates performed when compared to white candidates." 129 S. Ct. at 2673.  Here, on the other hand, the Court has determined that the residency requirement does subject the NHRFR to disparate impact liability.  Therefore, assuming the Court will enjoin the NHRFR from hiring from a Tri-county DOP list, the NHRFR would not be expanding the residency requirement because of race-bases statistics alone; it would be expanding the list because the residency requirement causes a disparate impact that is not justified by business necessity.  Therefore, although the Court is not adjudicating the merits of a case that has not been brought, the Court is not persuaded that <u>Ricci</u> provides the NHRFR with a defense to the present suit.  The Court having determined that the NHRFR's residency requirement violates the disparate impact provision of Title VII, the Court cannot see how the Intervenors can make out a claim of disparate treatment against the NHRFR when it expands its residency requirement to include the Tri-county area.

     *v.*     *Permanent Injunction*

The Plaintiffs argue that once "a district court finds racial discrimination, it is under a duty to render a decree which will both eliminate past discrimination but also bar discrimination in the future."  <u>United States v. County of Fairfax</u>, 629 F.2d 932, 941 (4th Cir. 1980) (citing <u>Albemarle Paper</u>, 422 U.S. at 418).

The NHRFR argues that the Court need not automatically enter an injunction upon a finding of disparate impact liability.  The NHRFR cites <u>Stolt Nielsen, S.A. v. United States</u>, 442 F.3d 177, 185 n.5 (3d Cir. 2006), for the proposition that a balance of the equities is required for

a permanent injunction.  In that case, the Court of Appeals noted that there was a conflict in

Court of Appeals decisions as to the requirements for granting a permanent injunction.

In <u>Chao v. Rothermel</u>, 327 F.3d 223, 228 (3d Cir. 2003), the Court of Appeals stated that

a permanent injunction may be granted "where the moving party has demonstrated that: (1) the

exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits

of its claim; and (3) the 'balance of equities' favors granting injunctive relief." <u>Id.</u> (citing <u>Ciba-

Geigy Corp. v. Bolar Pharm. Co.</u>, 747 F.2d 844 (3d Cir. 1984).

In <u>ACLU v. Black Horse Pike Reg'l Bd. of Educ.</u>, 84 F.3d 1471, 1477 & n.3 (3d Cir.

1996), on the other hand, the Court of Appeals held that the standard for granting a permanent

injunction differs from the standard for granting a preliminary injunction.  It noted that a district

court should consider four factors when deciding whether to issue a preliminary injunction, (1)

whether the movant has shown a reasonable probability of success on the merits; (2) whether the

movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief

will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary

relief will be in the public interest.  In contrast, "[i]n deciding whether a permanent injunction

should be issued, the court must determine if the plaintiff has actually succeeded on the merits

(i.e. met its burden of proof). If so, the court must then consider the appropriate remedy." <u>Id.</u>

(quoting <u>Ciba-Geigy</u>, 747 F.2d at 850).

The Defendants argue that it is unfair to enter an injunction in this case because "while

Regional Hispanics will have to compete against thousands more candidates for Regional jobs,

those same Hispanics are shut out of [] other paid firefighter jobs due to the [residency

requirements of]….East Orange, Elizabeth, Hoboken, Jersey City, New Brunswick, Newark,

Passaic, Paterson, Plainfield and Irvington."  Additionally, the "consent decree jurisdictions"—

"Atlantic City, Camden, East Orange, Elizabeth, Jersey City, New Brunswick, Newark, Passaic, Paterson, Plainfield and Trenton" are required to provide a program of recruitment and training aimed at increasing the number of minorities in the fire departments of the Consent Decree Jurisdictions.

Court has previously noted that the residency requirements of the various municipalities in New Jersey tend to produce inequitable results.  In the April 2010 Opinion, the Court observed that:

> [The] piecemeal system of residency requirements set by municipalities and court decrees [in New Jersey] has created an environment in which many applicants for civil service positions, like firefighters, are denied the opportunity to compete for positions in neighboring communities in an open, merit-based market fashion.  This drawing of lines around communities necessarily leads to statistical disparities between the make-up of the civil service workforce in a given community and make-up of the population of the community's surrounding areas.
>
> In an attempt to cure the disparate impact caused by community residential requirements, a number of communities, either by agreement or as a result of a court decree, have broadened their hiring area to include additional municipalities or counties.  As a result, applicants living in Municipality X that limits hiring to residents of Municipality X can apply for positions in a neighboring Municipality Y where residents are precluded from applying for positions in Municipality X.

North Hudson, 109 Fair Empl. Prac. Cas. (BNA) 262.

The New Jersey Supreme Court has previously concluded that a rational basis supports the legislature's endorsement of municipal residency requirements.  See, e.g., Abrahams v. Civil Serv. Comm'n, 65 N.J. 61 (1974).

The Plaintiffs argue that the practices of the other municipalities are irrelevant to the case instantly before the Court.  They assert that "[t]he Intervenors may initiate proceedings against

these municipalities if they have evidence [] that they are disproportionately denied employment opportunities in favor of lower-scoring residents of these municipalities."

The Court finds that under either standard enunciated by the Court of Appeals, a permanent injunction is merited here. The Court recognizes that the Intervenors and other residents of the Member Municipalities will now be required to compete with many more candidates for employment with the NHRFR; moreover, they will not be able to seek employment with the fire departments in some of the surrounding areas because they will be barred by the residency requirements of some other municipalities.  However, Title VII guarantees that people of all races will have the opportunity to compete equally on the basis of job-related criteria.  See Teal, 457 U.S. at 451.  The Court will not deny the Plaintiffs that opportunity based on the practices of other employers that are not presently before this Court. Ultimately, this case is about the NHRFR's residency requirements and its specific effects; the state's patchwork of residency requirements is not before the Court in this matter.

Having determined that the residency requirement causes a disparate impact on African American residents of the Tri-county area, the Court is compelled to enter a permanent injunction to remedy that disparate impact.  The Court will enjoin the NHRFR from hiring candidates from its current DOP list and from commencing hiring until it obtains a list from the DOP that expands the residency requirement to include residents of Hudson, Essex, and Union counties.

**C.**     **Defendants' Motion for Summary Judgment**

The NHRFR moves for summary judgment dismissing Plaintiffs' claims for failure to establish causation and because it claims to have asserted a valid business necessity defense.  In

light of the Court's determination that the Plaintiffs will be granted summary judgment, the

Court must deny the NHRFR's motion.

**D.      Intervenors' Motion for Summary Judgment**

The Intervenors argue that <u>Ricci</u> provides the Defendants with a defense to the Plaintiffs'

disparate impact claim, and seek a judgment that they are entitled to attorneys' fees as a

"prevailing party" for their role in the Court's April 23, 2010 vacation of the preliminary

injunction.  Having determined that the Plaintiffs are entitled to summary judgment on their

disparate impact claim, and that <u>Ricci</u> does not change the outcome of that determination, the

Court will deny the portion of the Intervenors' motion for summary judgment that seeks a

finding that <u>Ricci</u> provides the Defendants with a defense to the Plaintiffs' disparate impact

claim.

The Court will turn to the portion of the Intervenors' motion that seeks attorney fees for

the Intervenors' role in the Court's April 2010 vacation of the preliminary injunction.  Plaintiffs

contend that this application for attorneys' fees is entirely without merit.

Title VII provides that "the court, in its discretion, may allow" a "prevailing party" to

recover a "reasonable attorney's fee (including expert fees)."  42 U.S.C. § 2000e-5(k).  A party is

considered to be the prevailing party if "they succeed on any significant issue in litigation which

achieves some of the benefit the parties sought in bringing suit."  <u>Hensley v. Eckerhart</u>, 461 U.S.

424, 433 (1983).  In <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 421 (1978), the

Supreme Court set forth the standard for awarding damages to a prevailing defendant.  To

recover fees from the plaintiff, a defendant must show that "the plaintiff's action was frivolous,

unreasonable, or without foundation, even though not brought in subjective bad faith."  <u>Id.</u>  The

Court noted that "assessing attorney's fees against plaintiffs simply because they do not finally

prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." Id. at 422.

The Intervenors rely on Baker v. City of Detroit, 504 F. Supp. 841 (E.D. Mich. 1980), aff'd, Bratton v. City of Detroit, 704 F.2d 878 (6th Cir. 1983), cert. denied, 464 U.S. 1040 (1984), in which the district court determined that intervenors, "black police officers who have benefited or would benefit from affirmative action promotions" should be able to recover attorneys' fees from the plaintiffs. Id. at 848, 851. The court determined that the Christiansburg rule should not apply in that context. Id. In support of that conclusion, the district court noted that the black officers could have just as easily been plaintiffs had they been the ones to file suit against the city. Id. at 850. Moreover, the presence of counsel for intervenors was useful and necessary to help the black officers vindicate their rights.

However, the Court of Appeals has expressly declined to adopt a similar approach. In Pennsylvania v. Flaherty, 40 F.3d 57, 60-62 (3d Cir. 1994), the Commonwealth of Pennsylvania field suit under §§ 1981 and 1983[19] against the City of Pittsburgh alleging discrimination in the hiring of minority applicants by Pittsburgh's police department. The district court entered a preliminary injunction against the City, and the City did not appeal. Later in the litigation, the Fraternal Order of Police and a group of white male applicants who had applied for police officer positions intervened and moved to dissolve the injunction. The district court granted the intervening defendants' motion to dissolve the injunction and also granted their motion to recover attorneys' fees incurred in obtaining the dissolution of the injunction, assessing 75 percent of fees against the Commonwealth and 25 percent against the city. The Commonwealth

---

[19] Title VII and 42 U.S.C. § 1988 (which sets forth the fee-shifting provision for § 1983) use the same standard for awarding fees. See, Flaherty, 40 F.3d at 60 (citing Hensley, 461 U.S. at 433 n.7).

appealed.  The Court of Appeals recognized that while encouraging potential intervenors to become involved with the litigation is an important interest, it must be balanced against the interest in not discouraging plaintiffs from filing suit in the first instance.  Id. at 62.  The Court of Appeals determined that the correct balance may be achieved by applying the Christiansburg rule; thus, "[a] prevailing party may still only recover against a plaintiff in a civil rights suit where plaintiff's suit is frivolous, unreasonable, or groundless."  Id.

Here, it is clear that the Plaintiffs' claims were not frivolous, unreasonable, or without foundation; the Court has granted summary judgment for them on the merits of their claim.  Therefore, the Intervenors will not be able to recover attorneys' fees against them.

### III.  CONCLUSION

The Court will grant the Plaintiffs' motion for summary judgment and deny the NHRFR's and the Intervenors' motions for summary judgment.  The Court will enter an injunction permanently enjoining the NHRFR from hiring candidates from its current DOP list and from commencing hiring until it obtains a list from the DOP that expands the residency requirement to include residents of Hudson, Essex, and Union counties.  The Court will enter an order implementing this opinion.


    __s/ Dickinson R. Debevoise_____
    DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: September 21, 2010